Owen Yeates (12185)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
    Ste. 801
Washington, DC 20036
808-470-0506
oyeates@ifs.org

*Counsel for Grassroot Institute of Hawaii*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAII, a Hawaiʻi nonprofit corporation,<br><br>    *Plaintiff*,<br><br>    *v.*<br><br>ANNE E. LOPEZ, in her official capacity as Hawaiʻi Attorney General, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br><br>    *Defendants*. | Civil Action No.<br>  1:26-cv-00279<br>_____<br><br><br>**COMPLAINT** |

### INTRODUCTION

All Americans enjoy a fundamental First Amendment right to speak about

political issues and candidates. Americans also enjoy the right to associate, to pool

their resources, and to accordingly amplify their voices. To make their expression most effective—through newspapers, labor unions, trade associations, civil rights organizations, and the like—Americans must often organize corporations or other state-sanctioned entities. And when Americans organize such entities to participate in civic life, or to pursue their livelihoods—to run small businesses, to farm, or to manage property—they don't thereby lose the First Amendment right to speak about the issues and politicians who impact their communities, their families, and their lives.

To be sure, the fact that all people can speak when acting in the corporate form means that unpopular views get aired as well. But the solution to what some see as bad speech is more, better speech, not censorship. The First Amendment guarantees that lawmakers cannot pick and choose who gets to speak. Nor can lawmakers condition access to any legal benefit on forfeiting the fundamental right of free political speech.

Yet in an effort to silence unpopular speakers—something it cannot do— Hawai'i broadly outlawed political speech by so-called "artificial persons." This new categorical speech ban, made into law as Act 11, is flatly unconstitutional. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

Act 11 harms everyone. It silences organizations, preventing them from sharing information essential to their purposes. It denies the individuals constituting these groups—especially those not in the majority or not already exercising public instruments of power—the ability to pool their resources, and thus the ability to influence policy. And it harms the public, "restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id*. at 339 (quotation marks omitted). It thus diminishes the "right of citizens to inquire, to hear, to speak, and to use information to reach consensus," which "is a precondition to enlightened self-government and a necessary means to protect it." *Id*.

The Court should enjoin this unconstitutional law.

### JURISDICTION

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983, because it involves a deprivation under color of state law of rights secured by the United States Constitution.

### VENUE

2.     Venue lies in this Court pursuant to 28 U.S.C. § 1391, as the defendants reside in this judicial district, and all the events and omissions giving rise to the claim occurred in this judicial district.

PARTIES

3.      The Grassroot Institute of Hawaii is a Hawai'i nonprofit corporation, recognized by the IRS as tax-exempt under 26 U.S.C. § 501(c)(3).

4.      Defendant Anne E. Lopez is sued in her official capacity as the Attorney General of Hawai'i. The Attorney General is responsible for imposing penalties and bringing actions under Act 11. SB 2471 § 23, https://bit.ly/4ugZ9vO.

5.      Defendant Nadine Ando is sued in her official capacity as Director of the Hawai'i Department of Commerce and Consumer Affairs. The Director is responsible for imposing penalties and bringing actions under Act 11. SB 2471 § 23.

FACTS

*Grassroot Institute of Hawaii*

6.      The Grassroot Institute of Hawaii is not owned by any candidate, political party, or political committee. It was founded in 2001 to educate about the principles of individual liberty, economic freedom, and limited, accountable government.

7.      To maintain its role as an independent voice and government watchdog, Grassroot refuses any government funding. And as an IRS 501(c)(3) organization, Grassroot does not endorse or donate to political candidates or parties.

8.    Grassroot has historically opined on ballot issues that affect key areas of its mission, by publishing opinion pieces, granting media interviews, and mailing its views, electronically and physically, to supporters.

9.    Such advocacy includes the Honolulu Rail ballot initiative in 2008,[1] about which Grassroot has continued to share its opinions. In 2010, it shared arguments against SB 2807, the Hawaii Tax Rebates Amendment; arguments for HB 2376, the Hawaii Board of Education Amendment; and arguments against Honolulu County Question No. 1, a vote to create a semi-autonomous public transit authority.[2] And in 2018 Grassroot educated voters about issues raised by an education tax ballot measure.[3]

10.   About every two years, legislators propose a ballot measure to approve a constitutional amendment that would allow a state property tax. Grassroot

---

[1] *See, e.g.*, Tom McAuliffe, *Mayor should tone down transit rhetoric*, letter in Honolulu Star-Advertiser A7 (June 30, 2008), https://perma.cc/S8CU-DHK8.

[2] Malia Hill, *Hawaii's 2010 Ballot Measures*, Grassroot Institute of Hawaii (Oct. 26, 2010), https://perma.cc/HL7H-22YK.

[3] Keli'i Akina, *No way new tax won't cost us*, Grassroot Institute of Hawaii (Sept. 25, 2018), https://perma.cc/6JHV-BGAP.

repeatedly advocates against these measures being put on the ballot.[4] And it will continue to do so as they perennially pop up.

11.    In addition to advocating about ballot measures, Grassroot has directly participated in the process of adopting ballot measures. In 2018, Grassroot joined an amicus brief urging a court to keep a measure off the ballot.[5] And in 2025 it proposed multiple amendments to the Honolulu Charter,[6] one of which made it past the Charter Commission's first round of review in 2026.[7]

---

[4] *See, e.g., Reject effort by state to expand its taxing power via HB1537 HD1*, Grassroot Institute of Hawaii (Feb. 8, 2024), https://perma.cc/64ZH-DMZ6 (opposing HB1537, bill to send ballot measure to amend constitution to allow state tax on residential investment property); *Akina, Yamachika ponder legislative push for tax hikes*, Grassroot Institute of Hawaii (Feb. 17, 2022), https://perma.cc/8HBA-BS57 (discussing problems with HB1208, amendment to create state property tax); Keli'i Akina, *Increase economic freedom, not state tax burden*, Grassroot Institute of Hawaii (Jan. 31, 2021), https://perma.cc/EB6P-GCES (opposing constitutional amendment to allow state property tax); Keli'i Akina, *No way new tax won't cost us*, Grassroot Institute of Hawaii (Sept. 15, 2018), https://perma.cc/6JHV-BGAP (urging opposition to amendment to establish state property tax).

[5] Keli'i Akina, *Why we joined the 'surchage' lawsuit*, Grassroot Institute of Hawaii (Oct. 5, 2018), https://perma.cc/89BH-T5YK.

[6] Keli'i Akina, *Many of the proposed Honolulu Charter amendments actually make sense*, Grassroot Institute of Hawaii (Nov. 17, 2025), https://perma.cc/39S2-427P.

[7] *See* Grassroot Institute, *Honolulu Charter Commission OKs Grassroot ballot proposal*, Hawai'i Free Press (Jan. 18, 2026), https://perma.cc/T9V7-6X2F.

12.    Grassroot will advocate in 2026 about other ballot measures related to its mission that may appear on the ballot this year, including the proposal currently being reviewed by the Charter commission for an empty homes tax measure.[8]

13.    To educate about key public issues, and encourage the public to work together for change, Grassroot publishes timely research and commentaries, and organizes events, conferences and seminars. Grassroot has prepared a variety of white papers and policy briefs on topics ranging from housing for farmworkers to healthcare access, from Lahaina's wildfire recovery to pension debt, from the effects of the Jones Act to recovery from the coronavirus lockdown.[9]

14.    Grassroot holds events to review government action and inaction, as well as other issues facing the public, including discussions about the legislative sessions,[10] whether building up or out creates more affordable housing,[11] and

---

[8] Proposal 170, Honolulu Charter Commission (accessed June 2, 2026), https://perma.cc/8VQD-QUPX.

[9] *See Publications*, Grassroot Institute of Hawaii (accessed May 29, 2026), https://perma.cc/5RJF-UTJZ.

[10] *See, e.g., Grassroot upbeat as it wraps up its '2025 legislative wrap-up tour'*, Grassroot Institute of Hawaii (May 22, 2025), https://perma.cc/ZQX4-3KSA.

[11] *New report urges 'building out' to ease housing crisis*, Grassroot Institute of Hawaii (Feb. 19, 2019), https://perma.cc/2MG3-3VGN.

doctor shortages.[12]

15.    These events sometimes include officeholders, and officeholders may be discussed—at the event and in the subsequent posts about the events—including officeholders who may be candidates. An event in October 2024—to discuss a policy brief about recommendations to alleviate Hawaiʻi's housing crisis—included a Honolulu City Council member.[13] And an October 5, 2022 post described the September 2022 doctor shortage forum, at which a panelist discussed efforts by multiple officials running for reelection to alleviate the shortage, while an audience member stated she was running for the state house and criticized the lieutenant governor.[14]

16.    In educating the public on issues related to its mission, Grassroot communications frequently identify and discuss the actions and positions of elected officials. It publishes those communications through social media, mailings, and other means, whenever the issues are salient—such as when public

---

[12] *'Doctor shortage' forums highlight crisis but also potential policy remedies*, Grassroot Institute of Hawaii (Oct. 5, 2022), https://perma.cc/YTM3-3P4T.

[13] *See New report details 7 ways to cut Hawaii's building-permit delays*, Grassroot Institute of Hawaii (Oct. 29, 2024), https://perma.cc/X5XH-ZFHB.

[14] *'Doctor shortage' forums highlight crisis but also potential policy remedies*, Grassroot Institute of Hawaii (Oct. 5, 2022), https://perma.cc/YTM3-3P4T.

concern is heightened or legislative or executive action is being taken. Grassroot thus publishes the communications without regard to election dates, and sometimes within 30 days of primary elections and 60 days of other elections. While those elected officials are sometimes candidates in those elections, Grassroot does not tell voters whether to support or oppose them as candidates.

17. Before Act 11 was signed into law, Grassroot decided to form a § 501(c)(4) organization, to be called Grassroot Action Center. Grassroot's board requested and received from staff a proposal for the Action Center on October 17, 2025. Grassroot's board further considered questions about the Action Center on January 16, 2026, and the board approved the creation of the Action Center on April 10, 2026. Grassroot had discussions with a law firm about creating the Action Center on March 27, April 1, and April 20, 2026, and it sent an intake form to the firm on May 20, 2026.

18. The Action Center will serve as the primary vehicle for issue advocacy, legislative engagement, and grassroots mobilization for the Grassroot Institute of Hawaii at the local, state and federal levels, expanding the organization's ability to influence public policy and engage in robust lobbying.

19. The Action Center will not donate to candidates or advocate for or against candidates, but it will continue to inform the public about its legislative

activities, which would include discussions of the actions and positions of officials who are candidates, in communications and at events. It will also engage in advocacy for and against ballot measures.

20. Grassroot requests donations to help further its mission, for efforts such as "[d]efeating new taxes and tax increases" and "[i]ncreasing public awareness of laws that burden Hawaii," and to help it build a "movement by challenging bad ideas with good ones, through research, public events, our weekly newsletter and regular meetings with lawmakers."[15]

*SB 2471 / Act 11*

21. The Hawai'i legislature passed SB 2471 on May 8, 2026, and Governor Josh Green signed it into law on May 14, 2026, becoming Act 11.[16] The law is set to take effect on July 1, 2027. SB 2471 § 27.

22. Act 11 targets the sections of Titles 22, 23, and 23A of the Hawai'i Revised Statutes dealing with business corporations (Chapter 414), nonprofit corporations (Chapter 414D), professional corporations (Chapter 415A),

---

[15] *Contribute*, Grassroot Institute of Hawaii (accessed May 31, 2026), https://perma.cc/NN7A-QF73.

[16] *See* Hawai'i State Legislature, Measure Status SB 2471 (accessed June 5, 2026), https://www.capitol.hawaii.gov/session/measure_indiv.aspx?billtype=SB&billnumber=2471&year=2026

agricultural cooperative institutions (Chapter 421), consumer cooperative associations (Chapter 421C), limited-equity housing cooperatives (Chapter 421H), partnerships (Chapter 425), uniform limited partnerships (Chapter 425E), limited liability companies (Chapter 428), and unincorporated nonprofit associations (Chapter 429), as well as to credit unions (§ 412:10), to alter the powers with which they may act.

*Definitions*

23.    For the organizations it controls, Act 11 creates definitions whose scope far exceeds the scope of the definitions of political activity in the existing campaign finance statutes. That is, the definitions in the campaign finance statutes have provisions limiting the activity they subsume and regulate. For example, "independent expenditures" are limited to expenditures by natural or artificial persons that "*expressly advocat[e]* the election or defeat of a clearly identified candidate." HRS § 11-302 (emphasis added). And electioneering communications are those that refer "to a clearly identifiable candidate" when made within 30 days of a primary election and 60 days of other elections, but only if they are "not susceptible to any reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id*.

24. For business corporations (Chapter 414), nonprofit corporations (Chapter 414D), uniform limited partnerships (425E), limited liability companies (428), and nonprofit associations (429), however, Act 11 adds a number of new, broader definitions to prohibit their political activity.

25. Act 11 defines "artificial-person powers" as "the same powers as an individual to do all things necessary or convenient to carry out the corporation's lawful business and affairs, excluding any power to directly or indirectly engage in election activity or ballot-issue activity." SB 2471 § 4; *see also* §§ 8, 17, 19, and 22.

26. The law defines "ballot-issue activity" as "paying, contributing, or expending money or anything of value to support or oppose a constitutional amendment, county charter amendment, or other ballot question after it has been formally certified or submitted to the electors of the State or any county." SB 2471 § 4; *see also* §§ 8, 17, 19, and 22.

27. It similarly defines "election activity" as "paying, contributing, or expending money or anything of value to support or oppose a candidate, political committee, or political party." SB 2471 § 4; *see also* §§ 8, 17, 19, and 22. A candidate is "an individual who seeks nomination for election or seeks election to

office," where "office" refers to "any Hawaii elective public or constitutional office" other than a county neighborhood board or a federal office. HRS § 11-302.

28.   Act 11, however, allows media corporations to engage in election and ballot-issue activity by excluding their activity from the definitions. The definitions state that ballot-issue activity and election activity "do[] not include any bona fide news story, commentary, or editorial distributed through the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication." SB 2471 § 4; *see also* §§ 8, 17, 19, and 22.

29.   Hawaiʻi already defines both candidate and noncandidate committees. Both cover receiving contributions, making expenditures, or incurring financial obligations with the purpose of engaging in political activity: "on behalf of a candidate with the candidate's authorization" for candidate committees, and for "the purpose . . . influenc[ing] the nomination for election, or the election, of any candidate to office, or for or against any question or issue on the ballot." HRS § 11-302. Noncandidate committees include any "organization, association, party, or individual" engaging in such actions. *Id*.

30.   Act 11 establishes "political committees" as a new type of organization. The category envelopes a number of individuals and groups: "any person, group of persons, association, organization, or other entity"—apart from those already

organized as a candidate or noncandidate committee—"that receives contributions or makes expenditures for the purpose of influencing the nomination, election, or defeat of a candidate, or the passage or defeat of a ballot measure." SB 2471 § 4; *see also* §§ 8, 17, 19, and 22.

*Changes to organization powers to prohibit protected*
*First Amendment activities*

31.    The new law gives a precarious existence to organizations allowed to take corporate status, existing only at the state's pleasure, as Act 11 states that an organization's existence is not "a right but . . . a conditional grant of legal status . . . subject to complete withdrawal at any time." SB 2471 § 6; *see also* § 10 (nonprofit corporations), § 18 (limited partnerships), § 20 (limited liability companies), and § 21 (nonprofit associations).

32.    Act 11 strikes the statutory provisions previously granting corporations "the same powers as an individual to do all things necessary or convenient to carry out its business and affairs," replacing them with provisions granting only "artificial-person powers," § 6; *see also* § 10 (same for nonprofit corporations), § 18 (for limited partnerships, striking powers to do all things necessary for activities and replacing with artificial-person powers), § 20 (for limited liability companies, striking ability to organize "for any lawful purpose" and granting

artificial-person powers), and § 21 (for nonprofit associations, stating that they have artificial person powers).

33.    The law further states that any election or ballot-issue activity "shall be ultra vires and void," and that "[u]nder no circumstances shall" it "be deemed necessary or convenient for a corporation's lawful business purpose or affairs" to engage in election or ballot-issue activity. SB 2471 § 6; *see also* § 9-10 (same for nonprofit corporations), § 18 (limited partnerships), § 20 (limited liability companies), § 21 (nonprofit associations).

34.    Any attempt to engage in election and ballot-issue activity—to "exercise[] any power in violation of this subsection"—may trigger a number of "sanctions or penalties." SB 2471 § 6 (corporations); *see also* § 10 (nonprofit corporations), § 18 (limited partnerships), § 20 (limited liability companies, § 21 (nonprofit associations). Act 11 also states that limited liability partnerships that attempt to engage in election and ballot-issue activity "may be subject to . . . applicable sanctions or penalties." SB 2471 § 16.

35.    Credit unions (Section 412:10), professional corporations (Chapter 415A), agricultural cooperative institutions (Chapter 421), consumer cooperative associations (Chapter 421C), are similarly "subject to [the amended] section 414-42, including all limitations on corporate powers" and—necessarily—the penalties.

15

SB 2471 § 12 (professional corporations); *see also* § 3 (credit unions), § 13 (agricultural cooperative institutions), § 14 (consumer cooperative associations). Limited-equity housing cooperatives (Chapter 421H) experience the same power limitations and penalties, but subject to the amended 414D-52 rather than 414-42. SB 2471 § 15.

*Prohibition on protected First Amendment activities by foreign entities*

36.    HRS Chapters 414 and 414D already required that foreign corporations and foreign nonprofit corporations obtain a certificate of authority to transact business in the state. HRS §§ 414-431(a) and 414D-271(a). The lack of a certificate prevents a foreign corporation from bringing an action in any court in Hawaiʻi, *id*. at §§ 414-432(a) and 414D-272(a), and foreign corporations are liable for fees that should have been paid in the years they should have had a certificate, *id*. at §§ 414-432(d) and 414D-272(d). But failing to obtain a certificate does "not impair the validity of its corporate acts or prevent it from defending any proceeding in this State." *Id*. at §§ 414-432(e) and 414D-22(e).

37.    Moreover, the preexisting Chapters 414 and 414D state that foreign corporations and foreign nonprofit organizations have "the same but no greater rights and . . . the same but no greater privileges as . . . domestic corporation[s]." *Id*. at § 414-435(b); *see also id*. at § 414D-275(b). Nonetheless, the statutes "do[]

not authorize this State to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this State." *Id*. at §§ 414-435(c) and 414D-275(c).

38.    Act 11 amends the sections on general corporate powers for both foreign corporations and foreign nonprofit corporations to state that foreign corporations have the "same duties, restrictions, penalties, and liabilities as, a domestic corporation as provided in [the amended] section 414-435." SB 2471 § 6; *see* § 10 (foreign nonprofit corporations).

39.    It also adds subsections to Chapters 425, 425E, 428, and 429, stating that a foreign limited liability partnership, a foreign limited partnership, a foreign limited liability company, and a foreign nonprofit association, "shall have no greater rights or privileges than, and shall be subject to the same duties, restrictions, penalties, and liabilities as, a domestic limited liability partnership," § 16, "a domestic limited partnership," § 18, "a domestic limited liability company," § 20, or "a domestic nonprofit association," § 21.

*Penalties for engaging in protected First*
*Amendment activities*

40.    Act 11 adds a new chapter to HRS Title 23 authorizing the Attorney General or the Director of Commerce and Consumer Affairs to impose a variety of penalties for engaging in protected First Amendment activities—for participating

17

in election or ballot-action activities. They may temporarily suspend an entity's authority to operate or transact business in Hawai'i; prohibit or terminate state procurement contracts; revoke state tax exempt status; designate an entity as non-compliant and require further reporting; revoke the entity's charter, certificate, or other authorizing instrument to operate or do business in Hawai'i; or involuntarily dissolve the entity in Hawai'i. SB 2471 § 23.

41.    The new law similarly adds a new chapter to HRS Title 23A, giving the Attorney General and Director the authority to impose the same penalties on limited liability companies and unincorporated nonprofit associations. *Id*. § 24.

### *Press exemptions*

42.    Act 11 exempts certain speakers—the institutional press—from these regulations. It exempts "bona fide news story, commentary, or editorial" from the definitions of election activity and ballot-issue activity, but only those "distributed through the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication." SB 2471 § 4 (corporations); *see also* §§ 8 (nonprofit corporations), 17 (limited partnerships), 19 (limited liability companies), and 22 (unincorporated nonprofit associations).

43.    The Center for American Progress—which came up with the "legal strategy" underlying Act 11,[17] and drafted language for statutes implementing it[18]—states that these exemptions are for news corporations. "Limited exceptions must be made for media entities to allow for normal news reporting and opinion by news corporations."[19]

*The Regulatory Regime's Impact on Grassroot Institute*
*of Hawaii and Grassroot Action Center*

44.    Grassroot's mission requires that it continue engaging in ballot-issue activity, in 2027 and beyond, both with its (c)(3) and (c)(4) organizations. It would like to propose county charter amendments such as requiring fiscal notes and cost of government measures and state constitutional amendments such as reforming expenditure ceilings and balanced budget requirements, and to then advocate for those amendments. It is critical to Grassroot's mission that it fight for its own measures and advocate for and against others' ballot measures impacting individual liberty, economic freedom, and limited, accountable government. If it

---

[17] *See* Tom Moore, *Undoing* Citizens United *and Reining In Super PACs*, Center for American Progress (Sep. 15, 2025), https://bit.ly/4ugUQ4N.

[18] *See* Tom Moore, *The Corporate Power Reset That Makes* Citizens United *Irrelevant*, Center for American Progress (Sep. 15, 2025), https://bit.ly/3RJtV2S.

[19] *Id*.; *accord* Testimony by Tom Moore, Senate Committee on Commerce and Consumer Protection (Feb 3, 2026), https://bit.ly/495kCQX.

19

does so, however, it will face penalties for engaging in ballot-issue activity under Act 11, including the possibility of involuntary dissolution of both its (c)(3) and (c)(4) organizations.

45.    Accordingly, Grassroot must refrain from engaging in advocacy related to ballot measures after July 1, 2027, including preparatory research, writing, and activity that would need to be done before that date.

46.    Much of the legislative advocacy carried out by the Grassroot Institute, and to be carried out by the Action Center, requires that it discuss the actions and positions of officeholders who may also be candidates. Defendants may interpret communications that thus mention candidates as election activity under Act 11's broader definitions. And the Institute and the Action Center will face penalties under Act 11, including the possibility of involuntary dissolution. At the very least, Grassroot may face the burden of responding to and defending against complaints filed with the Department of Commerce and Consumer Affairs, requesting action against it by Defendants.[20]

---

[20] *See, e.g.,* Consumer Protection and Business Complaints, Department of Commerce and Consumer Affairs (accessed June 2, 2026), https://perma.cc/MKA9-W8KE (website for filing general complaints).

47. Accordingly, after July 1, 2027, Grassroot must refrain from legislative advocacy mentioning candidates within 30 days of a primary election or 60 days of a general election, including preparatory research, writing, and activity that would need to be done before that date.

48. Moreover, the vague terms in Act 11, such as those defining election activity, ballot-issue activity, and artificial person powers, leave Grassroot unsure when protected activity veers into prohibited activity. To avoid wandering into the shoals of vagueness, Grassroot must further censor its legislative and other issue advocacy.

49. Donors give to support future activity, and Act 11 impacts Grassroot's fundraising. Donors motivated by Grassroot's ballot-issue advocacy, and looking forward to the future uses of their money, will decline to give knowing that Act 11 prohibits such future activity. And the constraints that Act 11 places on future legislative and issues advocacy likewise inhibits present fundraising.

50. Grassroot will allow its attorneys to finish submitting the paperwork for the Action Center to the proper authorities. But Grassroot will refrain from activating the Center once approved, including funding it. One of the critical purposes of the Action Center is to engage in the advocacy discussed above, but it would face involuntary dissolution for engaging in such activities.

COUNT ONE
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV
42 U.S.C. § 1983

51.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50.

52.    The First Amendment, which applies against Hawaiʻi by operation of the Fourteenth Amendment, guarantees the right to free speech.

53.    The Supreme Court has long held that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. La.*, 379 U.S. 64, 74-75 (1964). And the First Amendment's protections have their "fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quotation marks omitted). "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . ." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) (quoting *Mills v. Ala.*, 384 U.S. 214, 218 (1966)) (quotation marks omitted). This would "of course include[e] discussions of candidates," *id*. (quotation marks omitted), but also public issues and ballot measures.

54.    A law like Act 11 is a "ban on corporate speech [even if it still allows] a PAC created by a corporation [to] speak." *Citizens United*, 558 U.S. at 337. But Act 11's ban on doing anything "to directly or indirectly engage in election activity

22

or ballot-issue activity," SB 2471 §§ 4, 6, 8, 10, 17, 18, 19, 20, and 22, prevents corporations and other organizations from using even the resources necessary to start a political committee.

55.   The Supreme Court has long "recognized that First Amendment protection extends to corporations." *Citizens United*, 558 U.S. at 342. And under later cases extending those precedents, "political speech does not lose First Amendment protection simply because its source is a corporation" *Id*. (quotation marks omitted).

56.   The First Amendment protects corporate speech as much for the corporations as for their contribution to the marketplace of ideas and the right of the people to hear those contributions and decide what they want to hear. "Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Id*. at 343 (quoting in parenthetical *Pac. Gas & Elec. Co. v. Pub. Utils. Com.*, 475 U.S. 1, 8 (1986) (plurality op.)).

57.   A ban like Act 11 thus "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id*. at 339 (quotation marks omitted). And it therefore violates "[t]he right of citizens to inquire, to hear, to speak, and to use

information to reach consensus," which "is a precondition to enlightened self-government and a necessary means to protect it." *Id*. at 339.

58.    The Hawai'i legislature claimed that the purpose of the Act is to "[r]eaffirm that artificial persons created under state law possess only those powers that are necessary or convenient to carry out lawful business and organizational purposes, and that those powers do not include the power to spend money or contribute anything of value to influence elections or ballot measures." SB 2471 § 1. But that is not a governmental interest, much less a substantial or compelling interest.

59.    Furthermore, Act 11 singles out a single class of speech, "expression at the core of our electoral process and of the First Amendment freedoms." *Buckley*, 424 U.S. at 39 (quotation marks omitted). That is, it applies only "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Act 11 is therefore a content-based restriction on speech, and it fails strict scrutiny.

60.    The First Amendment "[p]rohibit[s] . . . restrictions distinguishing among different speakers, allowing speech by some but not others," if for no other reason than that "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens* United, 558 U.S. at 340.

24

61.    Such discrimination robs the public of information "indispensable to decisionmaking in a democracy," *id*. at 349 (quotation marks omitted), and denies the dignity of a democratic people, usurping our right to get information from the sources they choose and of "the freedom to think for ourselves," *id*. at 356. And it deprives the disfavored speaker "the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.* at 340-41.

62.    "In the realm of protected speech," therefore, "the legislature is constitutionally disqualified from dictating . . . the speakers who may address [any] public issue," *id*. at 347 (cleaned up), much less core protected speech.

63.    Act 11 nonetheless discriminates between speakers, prohibiting political speech made by organizations that have taken the corporate form, but allowing the same speech by other speakers. And it likewise allows the same speech when made by media corporations—who it deems to share "bona fide" news stories—but prohibits it when made by others.

64.    On its face, and as applied against Plaintiff, its donors, and its audience, Act 11's content-based prohibition on political speech by disfavored entities that have taken the form of "artificial persons" violates the First Amendment right of speech.

25

65.    And it is no excuse that the state may be granting a benefit through corporate or other status. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "[D]eny[ing] a benefit . . . because of . . . constitutionally protected speech or associations" is to "penalize[] and inhibit[]" a person for the "exercise of those freedoms." *Id*. The government may not thus "produce a result which [it] could not command directly." *Id*. (quotation marks omitted).

66.    But by threatening corporations and other organizations with dissolution and other penalties if they engage in constitutionally protected political speech, and by conditioning foreign corporations' access to Hawaii on their surrender of First Amendment rights, the state has done precisely that. "Such interference with constitutional rights is impermissible." *Id*.; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (invalidating law that gave benefit to another, as laws that "inhibit robust and wide-open political debate without sufficient justification cannot stand"); *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (cannot bar benefit recipient from all protected activity).

67.    By enforcing these provisions, Defendants—under color of law—deprive Plaintiff, its donors, and its audience of the right of free speech in violation of the

26

First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983, and is therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Act 11's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
FREEDOMS OF ASSOCIATION, ASSEMBLY, AND PETITION
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

68.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50.

69.    The First Amendment, which applies against Hawaii by operation of the Fourteenth Amendment, guarantees the rights of assembly and association, and the right to petition the government for a redress of grievances.

70.    Corporations exist "to provide protection for human beings. . . . When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-07 (2014).

71.    Each of the "rights to speak, worship, publish, assemble, and petition . . . necessarily carries with it 'a corresponding right to associate with others.'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 224 L.Ed. 2d 672,

27

681 (2026) (quoting *Americans for Prosperity Foundation* v. *Bonta*, 594 U.S. 595, 606 (2021)). "With the freedom to associate, minorities can 'show their numerical strength,' influence policy, and 'stimulate competition' in the marketplace of ideas." *Id*. (quoting 1 A. de Tocqueville, *Democracy in America* 196-197 (H. Reeve transl., rev. ed. 1900)). On the other hand, attempts to restrain that freedom of association makes minority expression "particularly vulnerable to marginalization or outright suppression by the majority, leaving all of society poorer for it." *Id*. (quotation marks omitted).

72.     Restraining association also violates individuals' exercise of other First Amendment freedoms. "Without such a right, no two men could safely share the same soapbox, no two women the same church. The government could reduce any assembly to a party of one, and the right to petition would amount to nothing more than the power to sign one's own name alone." *Id*.

73.     Thus, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces" the First Amendment rights. *Id*.

74.    Hawaiʻi's stratagem of changing corporate powers is an attempted "nullification of [individuals'] right" of association before they can even arrive at the "moment of its assertion." *Id*. at 459. Grassroot may "assert these rights, because it . . . is but the medium through which its individual members seek to make more effective the expression of their own views," as well as their rights of petition and assembly. *Id*.

75.    Act 11's restrictions on associational freedoms are unsupported by any valid, let alone substantial or compelling, state interest. Furthermore, these restrictions are content-based, as they apply on the basis of the topics, ideas, or messages advanced by people's associations, and on the basis of the associations' identity. And Act 11 impermissibly conditions legal protections and benefits granted to people's associations on a forfeiture of core fundamental First Amendment rights.

76.    On its face, and as applied against Plaintiff, its donors, and its audience, Act 11 violates individuals' rights of association, assembly, and petition to influence policy.

77.    By enforcing these provisions, Defendants—under color of law—deprive Plaintiff, its donors, and its audience of the rights of assembly, petition, and association in violation of the First and Fourteenth Amendments to the United

States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983, and is therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Act 11's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
FREEDOM OF THE PRESS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

78.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50.

79.    The First Amendment, which applies against Hawai'i by operation of the Fourteenth Amendment, guarantees the freedom of the press.

80.    "The liberty of the press is not confined to newspapers and periodicals," but rather "in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). About the most pressing issues of the day, through others' papers and their own papers and pamphlets, "[b]oth corporations and voluntary associations [have long] actively petitioned the Government and expressed their views." *Citizens United*, 558 U.S. at 389 (Scalia, J., concurring).

81.    Press entities regularly produce endorsements expressly advocating for or against candidates and ballot measures. Stating that it must act as "a community-

30

corporate citizen,"[21] the Honolulu Star-Advertiser has endorsed candidates,[22] as well as advocated for and against ballot measures.[23]

82.    Likewise, press entities regularly cover the events and actions of various candidates for office, even close to the election, and name those candidates and

---

[21] Star-Advertiser staff, *Recapping our election choices*, Honolulu Star Advertiser (Nov. 1, 2010), https://perma.cc/48BR-M5UA (making endorsements across state races as "a community-corporate citizen," as the paper "cannot ignore engagement if we are urging voters to do so").

[22] *Editorial: Review all options before casting vote*, Honolulu Star-Advertiser (Nov. 4, 2024), https://perma.cc/EPT9-63QP; *Editorial: Best candidates guided by service to constituents*, Honolulu Star Advertiser (Nov. 6, 2022), https://perma.cc/8SUQ-T7NA (endorsements in various state races at a time when voters "will not tolerate corruption unearthed at every level of government"); *Editorial: Ige, Green best choice for isles*, Honolulu Star-Advertiser (Oct. 14, 2018), https://perma.cc/MJX9-4JQC (urging that David Ige was "the best choice to lead the state"); Star-Advertiser staff, *David Ige our choice for governor*, Honolulu Star-Advertiser (Oct. 19, 2014), https://perma.cc/R8WV-T4AT; *see also* Richard Wiens, *It's Time to Vote! Bring Along Our Candidate Q&As*, Honolulu Civil Beat (Oct. 21, 2024), https://perma.cc/6PUJ-EY54.

[23] *See Editorial: No controversy to ratify amendments*, Honolulu Star-Advertiser (Oct. 23, 2024), https://perma.cc/7QMN-GDCB; *Editorial: Amendments will strengthen city charter*, Honolulu Star-Advertiser (Oct 30, 2022), https://perma.cc/VS9S-KQ8N; *Editorial: No good reason for ConCon now*, Honolulu Star-Advertiser (Oct. 22, 2018), https://perma.cc/SM8S-UFKY; Star-Advertiser staff, *GMO initiative would be bad law*, Honolulu Star-Advertiser (Oct. 30, 2014), https://perma.cc/52AX-Z5ES; *see also Richard Wiens*, *Maui Makes Sure Its County Elections Are Decided In November. Oahu Should Do The Same*, Honolulu Civil Beat (Sept. 29, 2024), https://perma.cc/49M2-3556 (urging future changes to Honolulu charter).

office holders. This has included newspaper articles about events and actions in Hawai'i.[24]

83.     Act 11 exempts certain speakers—the institutional press—from these regulations. It exempts "bona fide news story, commentary, or editorial" from the definitions of election activity and ballot-issue activity, but only those "distributed through the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication." SB 2471 § 4 (corporations); *see also* §§ 8 (nonprofit corporations), 17 (limited partnerships), 19 (limited liability companies), and 22 (unincorporated nonprofit associations).

84.     But other corporations are similarly "vehicle[s] of information and opinion," *Lovell*, 303 U.S. at 452, apprising the public of government officials' action and inaction about the most important issues of the day—even when they are candidates. And they have likewise "actively petitioned the Government and

---

[24] *See, e.g.,* Peter Boylan, *Hawaii lawmakers are drafting bill to create more ways to charge serious felonies*, Honolulu Star-Advertiser (Sept. 27, 2022), https://perma.cc/QBH9-JQJX (discussing efforts of state senators like Karl Rhoads to pass law to "give prosecutors more than one way to charge serious felonies" after court ruling affected felony charges); *see also Hawaii State Senate elections, 2022*, Ballotpedia (accessed June 2, 2026), https://perma.cc/67L4-PY67 (noting senators running for election, including Rhoads).

expressed their views" about pressing issues. *Citizens United*, 558 U.S. at 389 (Scalia, J., concurring).

85.    Despite the important functions served by the press—in both its institutional and non-institutional forms—the state has with Act 11 arrogated to itself the power to prohibit all corporations the right to use the press. And it has then pretended to return to certain corporations the right to use the press, but only by the grace of government. "But the First Amendment . . . does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). The rationale underlying Act 11 "would produce the dangerous, and unacceptable, consequence that [the legislature] could ban political speech of media corporations," *Citizens United*, 558 U.S. at 351 (citations omitted), as well as others using the press. The First Amendment has left neither the corporations wishing to use the press to speak about important issues, nor the public choosing to use them for information, at the mercy of the government.

86.    Act 11's restrictions on press freedoms are unsupported by any valid, let alone substantial or compelling state interest. Furthermore, these restrictions are content-based, as they apply on the basis of the topics, ideas, or messages advanced by people's associations, and on the basis of the associations' identity.

And Act 11 impermissibly conditions legal protections and benefits granted to people's associations on a forfeiture of core fundamental First Amendment rights.

87.    On its face, and as applied against Plaintiff, its donors, and its audience, Act 11 violates the First Amendment in denying most "artificial persons" the right to use the press to discuss the most important matters of the day.

88.    By enforcing these provisions, Defendants—under color of law—deprive Plaintiff, its donors, and its audience of the freedom of the press in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983, and is therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Act 11's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR
OVERBREADTH, U.S. CONST. AMENDS. I, XIV
42 U.S.C. § 1983

89.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50.

90.    "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

91.    Act 11 is unconstitutionally overbroad on its face because it restricts a substantial amount of protected speech relative to any negligible if not nonexistent, legitimate sweep. For example, even if Hawaii could deprive domestic entities of their ability to discuss political affairs, it has no authority to limit the powers other states grant to their corporate entities.

92.    By enforcing these provisions, Defendants—under color of law—deprive Plaintiff, its donors, and its audience of the rights of speech, assembly, petition, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983, and is therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Act 11's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FIVE
VOID FOR VAGUENESS,
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

93.    Plaintiff realleges and incorporates by reference paragraphs 1 through 50.

35

94.     The First and Fourteenth Amendments prohibit the enforcement of vague laws.

95.     Act 11's regulatory scheme provides no way of knowing the difference between bona fide news and prohibited activity. And the definitions of ballot-issue activity, election activity, and artificial-person powers under Act 11 are vague in that they do not clearly warn speakers about what activity will trigger Act 11's penalties. The Attorney General and the Director of the Department of Commerce and Consumer affairs—on their own or prompted by political and ideological opponents filing complaints to harass their adversaries into silence—may thus prohibit almost any "discussion of governmental affairs." *Buckley*, 424 U.S. at 14. And even if speakers ultimately triumph in defending their rights after investigation and enforcement, it will be only after fighting in administrative proceedings and the courts a battle whose conclusion they did not know. Act 11 therefore "may not only trap the innocent by not providing fair warning or foster arbitrary and discriminatory application but also operate to inhibit protected expression by inducing citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. at 41 n.48 (internal quotation marks omitted) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

36

96.    Act 11 is therefore void for vagueness.

97.    By enforcing these provisions, Defendants—under color of law—deprive Plaintiff, its donors, and its audience of the rights of speech, press, assembly, petition, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff is thus damaged in violation of 42 U.S.C. § 1983, and is therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Act 11's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYER FOR RELIEF

WHEREFORE, Grassroot Institute of Hawaii requests that judgment be entered in its favor as follows:

1. Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the provisions of Act 11, including any related sanctions or fines, or in the alternative, from enforcing against Grassroot Institute of Hawaii the provisions of Act 11, including any related sanctions or fines.

2. Declaratory relief consistent with the injunction, to the effect that Act 11 is unconstitutionally void and unenforceable, as it violates the First Amendment rights of speech, association, petition, assembly, and the press, facially and as applied to Grassroot Institute of Hawaii; and that Act 11 is unconstitutionally overbroad;

3. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

4. Any other relief as the Court deems just and appropriate.

Respectfully submitted,

s/ Owen Yeates
Owen Yeates
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste. 801
Washington, DC 20036
Local mailing address:
    P.O. Box 31
    55-510 Kamehameha Hwy Ste. 20
    Laie, HI 96762
oyeates@ifs.org
Telephone: 808-470-0506

Dated: June 5, 2026                    *Counsel for Plaintiff*