Owen Yeates (12185)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
    Ste. 801
Washington, DC 20036
808-470-0506
oyeates@ifs.org

*Counsel for Grassroot Institute of Hawaii*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAII, a Hawaiʻi nonprofit corporation, | Civil Action No. 1:26-cv-00279-LEK-RT |
| *Plaintiff*, | |
| *v.* | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| ANNE E. LOPEZ, in her official capacity as Hawaiʻi Attorney General, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs, | Date and time of hearing: TBD<br>Presiding Judge: Honorable Leslie E. Kobayashi<br>Trial Date: TBD<br>Relating docket no.: 15 |
| *Defendants*. | |

TABLE OF CONTENTS

Table of Authorities ................................................................................... iv

Introduction .................................................................................................1

Statement of Facts .......................................................................................3

    I.       Grassroot Institute of Hawaii .................................................3

    II.      Act 11 .....................................................................................4

    III.    Act 11's Impact on Grassroot's speech ..................................5

Argument .....................................................................................................7

    I.       Grassroot will succeed on the merits ......................................7

        A.    Corporations enjoy a First Amendment right to speak, including the right to speak about elections. ................................................7

        B.    The state's control over corporate law does not permit it to sidestep or override the First Amendment's protections. ..........................................8

        C.    Strict scrutiny applies to Act 11's speech prohibitions. ........................16

        D.    Hawaiʻi cannot demonstrate any valid, let alone compelling, interest for Act 11 .......................................................................................18

        E.    Hawaiʻi's speech ban does not further a compelling interest ...............20

        F.    Act 11 is unconstitutionally vague. ...................................................23

        G.    Act 11 is unconstitutionally overbroad .............................................25

    II.      Act 11 irreparably harms Grassroot .......................................27

    III.    The balance of equities, and the public interest, favors Grassroot ............28

    IV.    This Court should enter a permanent injunction .....................................29

Conclusion ...............................................................................................30

TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*,
        509 U.S. 544 (1993)................................................................................9

*Ariz. Dream Act Coal. v. Brewer*,
        855 F.3d 957 (9th Cir. 2017) ...............................................................29

*Atherton v. FDIC*,
        519 U.S. 213 (1997)..............................................................................26

*Barahona-Gomez v. Reno*,
        167 F.3d 1228 (9th Cir. 1999) ..............................................................30

*Branzburg v. Hayes*,
        408 U.S. 665 (1972)..............................................................................12

*Buckley v. Valeo*,
        424 U.S. 1 (1976)........................................................................ passim

*Burwell v. Hobby Lobby Stores, Inc.*,
        573 U.S. 682 (2014)..............................................................................10

*Chiles v. Salazar*,
        146 S. Ct. 1010 (2026)...........................................................................9

*Citizens United v. FEC*,
        558 U.S. 310 (2010).................................................................... passim

*CTIA - The Wireless Ass'n v. City of Berkeley*,
        928 F.3d 832 (9th Cir. 2019) ................................................................28

*Davis v. FEC*,
        554 U.S. 724 (2008)..............................................................................20

*Doe v. San Diego Unified Sch. Dist.*,
        19 F.4th 1173 (9th Cir. 2021) ...............................................................28

*E.K. v. DOD Educ. Activity*,
    807 F. Supp. 3d 517 (E.D. Va. 2025) ..............................................................30

*East Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2021) ...........................................................................7

*Elrod v. Burns*,
    427 U.S. 347 (1976) .......................................................................................28

*FEC v. Beaumont*,
    539 U.S. 146 (2003) .......................................................................................25

*FEC v. Nat'l Conservative Political Action Comm.*,
    470 U.S. 480 (1985) ................................................................................ 18, 20

*FEC v. Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007) .......................................................................................24

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
    146 S. Ct. 1114, 224 L.Ed. 2d 672 (2026) ....................................................11

*First Nat'l Bank v. Bellotti*,
    435 U.S. 765 (1978) .......................................................................................13

*Flexible Lifeline Sys. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011) .........................................................................29

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .......................................................................................23

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .........................................................................28

*In re Ala Moana Props. Ltd.*,
    563 P.3d 694 (Haw. Ct. App. 2025) ..............................................................26

*L.A. Press Club v. City of L.A.*,
    790 F. Supp. 3d 838 (C.D. Cal. 2025) ...........................................................30

v

*Lee v. Fisher*,
  70 F.4th 1129 (9th Cir. 2023).......................................................................26

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938).............................................................. 12, 13, 22

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...................................................................................1

*McCutcheon v. FEC*,
  572 U.S. 185 (2014)................................................................................18

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958)...............................................................................11

*NAACP v. Button*,
  371 U.S. 415 (1963)..................................................................................8

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..................................................................................8

*Obsidian Fin. Group, LLC v. Cox*,
  740 F.3d 1284 (9th Cir. 2014).................................................................12

*Perry v. Sindermann*,
  408 U.S. 593 (1972)........................................................................ 13, 14

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)............................................................... passim

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013).................................................................29

*Rust v. Sullivan*,
  500 U.S. 173 (1991)................................................................................14

*SEC v. John Adams Tr. Corp.*,
  697 F. Supp. 573 (D. Mass. 1988)...........................................................10

*Short v. Brown*,
893 F.3d 671 (9th Cir. 2018) ................................................................7

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) .............................................................20

*Thomas v. Cty. of Riverside Sheriff's Dep't*,
No. EDCV 10-01846 VAP(DTBx), 2011 U.S. Dist. LEXIS 164992 (C.D.
Cal. July 7, 2011) ................................................................................30

*Thomas v. Zachry*,
No. 3:17-cv-0219-LRH-WGC, 2017 U.S. Dist. LEXIS 75389 (D. Nev. May
17, 2017) .............................................................................................29

*United States v. Stevens*,
559 U.S. 460 (2010) .............................................................................25

*United States v. Williams*,
553 U.S. 285 (2008) .............................................................................23

**Statutes**

2026 Haw. Act 11 ................................................................... passim

HRS § 11-302.................................................................... 23, 24

HRS § 429-1......................................................................27

**Regulations**

11 C.F.R. § 114.1(a)(2)(iii)................................................................15

11 C.F.R. § 114.5(b) ........................................................................15

**Rules**

Fed. R. Civ. P. 65(a)(2)....................................................................29

**Treatises**

Restatement (Second) of Conflict of Laws, § 302 (1988) ......................................26

**Other Authorities**

A. de Tocqueville, *Democracy in America* (H. Reeve transl., rev. ed. 1900).........11

A. Kam Napier, *Q&A with state Sen. Jarrett Keohokalole on SB2471*, Aloha State
     Daily (May 7, 2026) ..................................................................................4, 12

Eric Chaffee, *George A. Leet: Business Law Symposium: Corporate Law and
     Private Ordering*, 74 Case W. Res. 1 (2023) ............................................9, 10

*S.B. 2471, Relating to the Powers of Artificial Persons*: Before the House
     Committee on Judiciary & Hawaiian Affairs, 2025 Leg. (Apr. 8, 2026)......21

*S.B. 2471, Relating to the Powers of Artificial Persons*: Before the Senate
     Committee on Commerce and Consumer Protection, 2025 Leg. (Feb. 3,
     2026) (Attachment A to statement of Tom Moore) ......................................8

Tom Moore, *Undoing* Citizens United *and Reining In Super PACs*, Center for
     American Progress (Sep. 15, 2025)...................................................... 17, 19

INTRODUCTION

To protect the voices of ordinary Hawaiians from being drowned out in public debate, the state has silenced the very groups those citizens use to make themselves heard. This sort of tinkering with speech rights is not only illogical—it's unconstitutional.

To make their expression effective, Americans turn to newspapers, labor unions, trade associations, civil rights organizations, and the like, which must generally organize as corporations or other state-sanctioned entities. And when Americans organize such entities to participate in civic life and protect their livelihoods, they don't thereby lose the First Amendment right to speak about the issues and politicians who impact their communities, their families, and their lives.

That anyone can organize for expressive purposes of course means that unpopular views get amplified as well. But the First Amendment denies government the power to pick and choose who can speak. Rather, "the First Amendment's purpose to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail" requires that citizens be free to organize and make their views known, and for the voters to decide whose expression they will value. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quotation marks omitted).

1

Yet Hawai'i's Act 11 broadly outlaws political speech by so-called "artificial persons" in the hopes of silencing unpopular speakers. The Supreme Court has already said that speech bans like Hawai'i's Act 11 are unconstitutional, in part because they do not further any compelling governmental interest. And the state cannot save the Act by claiming that it merely eliminates the power to speak before any right can attach, as the First Amendment disfavors prior restraint even more than post-speech punishment. Moreover, the First Amendment protects corporations because they represent the speech of real individuals.

Act 11 harms everyone: the organizations that cannot share information essential to their purposes, the individuals seeking to pool their resources to influence public policy, and the public. By limiting the "issues discussed, the depth of their exploration, and the size of the audience reached," speech bans diminish the "right of citizens to inquire, to hear, to speak, and to use information to reach consensus," which "is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quotation marks omitted).

The Court should enjoin this unconstitutional law.

2

STATEMENT OF FACTS

I.    GRASSROOT INSTITUTE OF HAWAII

The Grassroot Institute of Hawaii is an IRS 501(c)(3) organization founded "to educate about the principles of individual liberty, economic freedom, and limited, accountable government." Akina Decl. ¶¶ 3-4. It "has a history of advocating for or against ballot issues that affect key areas of its mission." *Id.* ¶ 5. To "educat[e] the public and leaders about key public issues," Grassroot also "publishes timely research and commentaries, and it organizes events, conferences and seminars." *Id.* ¶ 10. Grassroot communications about important issues may discuss the actions of elected officials who are candidates, *id.* ¶ 13, and such officials may be discussed at events and event recaps, *id.* ¶ 12.

In 2025 and 2026, Grassroot's board discussed the creation of an IRS 501(c)(4) organization, approving it in April 2026. *Id.* ¶ 14. The Grassroot Action Center would expand Grassroot's "ability to influence public policy and engage in robust lobbying," including ballot measure advocacy. *Id.* ¶¶ 15-16.

Grassroot's donors give to support its legislative and ballot advocacy. *See id.* ¶ 17; Monoscalco Decl. ¶¶ 5-6; Corboy Decl. ¶ 7.

3

II.      ACT 11

Hawai'i's Act 11 takes effect on July 1, 2027. 2026 Haw. Act 11, § 27, Ex. A.

The Act prohibits "corporations or other artificial persons" from spending money

"in connection with elections and ballot measures," *id.* § 1, and thus pushes any

remaining money spent into forms the state can monitor and publicize.[1] The Act

broadly governs corporations, partnerships, companies, and unincorporated

associations, as well as credit unions. *Id.* §§ 3-22.[2]

Act 11 prohibits spending on speech and other forms of advocacy by limiting

covered entities to what it calls "artificial-person powers," which "exclude[] any

power to directly or indirectly engage in election activity or ballot-issue activity."

*Id.* § 4. It then defines election activity and ballot-issue activity as spending

---

[1] A. Kam Napier, *Q&A with state Sen. Jarrett Keohokalole on SB2471*, Aloha
State Daily (May 7, 2026), https://perma.cc/5WXL-93TS, Ex. B (to create
"transparency").

[2] The Act largely makes the same changes for business corporations, Act 11, §§ 4-
7; nonprofit corporations, *id*. §§ 8-11; limited partnerships, *id*. §§ 17-18; limited
liability companies, *id*. §§ 19-20; and unincorporated nonprofit associations, *id*.
§§ 21-22, by adding definitions for artificial person powers, election activity, and
ballot-issue activity, and then limiting the entity to exercising only artificial person
powers. Given that the essential changes are repeated, and to avoid unnecessarily
repetition, this brief will generally cite to §§ 4-7 as representative of the other
sections. The Act limits the other types of entities by making them subject to the
provisions for business and nonprofit corporations. *See id*. §§ 12-16.

4

"money or anything of value to support or oppose a candidate" or ballot question. *Id*.

The law exempts "bona fide news story, commentary, or editorial distributed through" media corporations—through "the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication"—from the prohibition. *Id*. But it otherwise threatens a range of penalties for engaging in political activity, up to dissolution of the entity. *Id.* § 23. Act 11 also attempts to limit election and ballot activity by foreign corporations by stating that they have no more authority than similar domestic corporations. *Id.* § 6.

III.        ACT 11'S IMPACT ON GRASSROOT'S SPEECH

Grassroot has a long history of engaging in ballot-issue activity, Akina Decl. ¶¶ 5-8, and its "mission requires that it use its (c)(3) and (c)(4) organizations to" continue engaging in ballot-issue activity, now and in the future, *id.* ¶¶ 9, 18. This would include advocating against future iterations of the state property tax amendment, *id.* ¶ 7, and advocating for measures that would, for example, require fiscal notes in the counties and reforming balanced budget requirements, *id.* ¶ 18. Grassroot fears Act 11's penalties for engaging in its planned future ballot-issue activity. *Id.* ¶¶ 18-19.

The organization also has a long history of engaging in legislative advocacy—including both lobbying and grassroots efforts—to seek change about important public issues, *id.* ¶¶ 10-13, and its mission requires that it continue to engage in legislative advocacy, *id.* ¶ 20. Grassroot fears, however, that defendants will use Act 11's broad definitions of election activity to punish its legislative activities. *Id.* ¶ 20.

Because of Act 11's penalties for engaging in ballot-issue activity, Grassroot must cease advocacy regarding ballot measures relevant to its mission, including the preparatory research and planning that must begin before that date. *Id.* ¶ 19. Grassroot will likewise have to refrain from legislative advocacy that mentions candidates, including preparatory research and planning, or weaken that advocacy by deleting mention of candidate-officeholders. *Id.* ¶ 21.

Grassroot also faces present harm because Act 11 has prohibited activities for which Grassroot was creating the Action Center. *Id.* ¶ 24. Grassroot therefore refrains from taking certain further steps to activate and fund the Center. *Id.*

Act 11 has also harmed Grassroot's current fundraising and its ability to plan based on promised funding. *Id.* ¶ 23. Longstanding donors have already said that Act 11 will force them to decrease or forego donations to Grassroot and its Action Center. Monoscalco Decl. ¶¶ 6-7; Corboy Decl. ¶ 7.

ARGUMENT

Grassroot is entitled to a preliminary injunction because (1) it is "likely to succeed on the merits;" (2) it will "suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018). "When the government is a party, these last two factors merge." *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2021) (citations omitted).

I.    GRASSROOT WILL SUCCEED ON THE MERITS

   A.    Corporations enjoy a First Amendment right to speak, including the right to speak about elections.

Act 11's defining purpose is to "[r]eaffirm that artificial persons[' powers]...do not include the power to spend money or contribute anything of value to influence elections or ballot measures." Act 11, § 1. But the Supreme Court has long "recognized that First Amendment protection extends to corporations." *Citizens United*, 558 U.S. at 342 (compiling cases). The NAACP is a corporation. *NAACP*

*v. Button*, 371 U.S. 415, 428 (1963). The *New York Times* is a corporation. *New York Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964).[3]

And "political speech" in particular "does not lose First Amendment protection simply because its source is a corporation" *Citizens United*, 558 U.S. at 342 (quotation marks omitted). The Court there upheld the rights of a nonprofit corporation—and the rights of the people who formed and funded it—to criticize a presidential candidate.

These are longstanding First Amendment protections, and Hawai'i has not discovered the "one weird trick" that will let it circumvent them. Hawai'i's various theories purporting to enable a legislative First Amendment override lack merit.

    B.    The state's control over corporate law does not permit it to sidestep or override the First Amendment's protections.

Act 11's proponents argue that the law is constitutional because it removes the power to speak before any rights can "attach" to that power: *S.B. 2471, Relating to the Powers of Artificial Persons* 18: Before the Senate Committee on Commerce and Consumer Protection, 2025 Leg. (Feb. 3, 2026) (Attachment A to statement of Tom Moore), Ex. W.; *cf.* Act 11, § 1 ("powers conferred...are separate and distinct

---

[3] For brevity and ease of communication, the term corporation in this brief refers to all the silenced organization types, unless otherwise indicated.

from the rights retained by natural persons"). But "[t]he First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by mere labels." *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026) (quotation marks omitted). A "prohibition on corporate independent expenditures is...a ban on speech." *Citizens United*, 558 U.S. at 339. It does not matter whether that ban is a prior restraint refusing permission to speak, or if it is a subsequent punishment for speech already made, except that "the First Amendment [provides] greater protection from prior restraints [like Act 11] than from subsequent punishments." *Alexander v. United States*, 509 U.S. 544, 554 (1993).

      1.    *Act 11 relies on a corporate law theory rejected by the Supreme Court's First Amendment doctrine.*

The state asserts "plenary authority" to deny corporations the power to speak about political matters under a theory that fails in the First Amendment context. Act 11, § 1. Under this "artificial entity theory" of corporations, "the state has complete power to define [a corporation's] rights and responsibilities" because the corporation is "an artificial entity…ow[ing] its existence completely to the state." Eric Chaffee, *George A. Leet: Business Law Symposium: Corporate Law and Private Ordering*, 74 Case W. Res. 1, 1 (2023). But "[t]he flow of Anglo-Saxon corporate law from Coke to Denning has standfastly sought to avoid...the anthropomorphic fallacy" resulting from such theories "that the corporation was

9

but an individual." *SEC v. John Adams Tr. Corp.*, 697 F. Supp. 573, 579 n.6 (D. Mass. 1988) (quotation marks omitted).

The aggregate theory of corporate law, on the other hand, holds that "the corporation is merely the sum of the relationships among the individuals involved with the corporation," and that the corporation's rights and responsibilities "derive from the rights and responsibilities of the individuals composing it." Chaffee, 74 Case W. Res. at 2-3. This theory may also have shortcomings—each of the theories both "reflects some of the attributes of the modern corporation" and is on its own "incomplete." *Id*. at 3.

But, as far as First Amendment rights are concerned, the Supreme Court has followed the aggregate theory rather than the state's "artificial entity" theory, at least partially rooting First Amendment protections in their members' and supporters' rights, which the state cannot nullify. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), for example, the Supreme Court held that "[w]hen rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the [underlying] rights of these people." *Id*. at 706-07. And that is why each of the First Amendment "rights to speak, worship, publish, assemble, and petition" are "necessarily [bound to] a corresponding right to

associate with others." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 224 L.Ed. 2d 672, 681 (2026) (quotation marks omitted).

This freedom of association makes it possible to effectively exercise the other rights, to "'show their numerical strength,' influence policy, and 'stimulate competition' in the marketplace of ideas." *Id.* (quoting 1 A. de Tocqueville, *Democracy in America* 196-197 (H. Reeve transl., rev. ed. 1900)). But if courts fail to protect the rights of individuals to unite in sharing their views, "[t]he government could reduce any assembly to a party of one," limiting "the right to petition...to nothing more than the power to sign one's own name alone," and allowing the "marginalization or outright suppression" of minority expression. *Id.*

A corporation like Grassroot may "assert these [First Amendment] rights, because it...is but the medium through which its individual members seek to make more effective the expression of their own views." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958); *see also Citizens United*, 558 U.S. at 392 (Scalia, J., concurring) ("right to speak on their behalf"). Act 11 cannot "nullif[y]" a corporation's ability to exert its members rights before it can even try to "assert[]" them. *NAACP*, 357 U.S. at 459.

2.    *Act 11 relies upon a fundamental misunderstanding of the Press Clause.*

Standing alone, Hawaiʻi's misplaced reliance on the artificial entity theory would enable it to ban *Hawaii News Now*, the *Honolulu Star-Advertiser*, or the *New York Times*. In an attempt to minimize that problem and make Act 11 appear less radical, lawmakers exempted certain news corporations from the Act's reach. Act 11, § 4. State Senator Jarrett Keohokalole defended that exemption by noting that "[t]he press is specifically enumerated in the Constitution." Napier, *Q&A*, Ex. B. Not only does this excuse contradict Act 11's underlying theory—that a state may elide the First Amendment's protections by attacking a corporation's powers—it misunderstands the Press Clause.

"[L]iberty of the press is the right of the lonely pamphleteer…just as much as of the large metropolitan publisher." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972). The press protections "do not turn on whether the defendant was a trained journalist[ or] formally affiliated with traditional news entities." *Obsidian Fin. Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014). And "[t]he liberty of the press is not confined to newspapers and periodicals," but "comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

12

Act 11 exempts media corporations' election and ballot-issue activity as "bona fide news story, commentary, or editorial," because it is "distributed through the" institutional media. Act 11, § 4. But the Act prohibits other corporations acting as "vehicle[s] of information and opinion," *Lovell*, 303 U.S. at 452, from "actively petition[ing] the Government and express[ing] their views," *Citizens United*, 558 U.S. at 389 (Scalia, J., concurring).

If the state's theory were correct, it could prohibit any corporation from exercising its press rights—including the media. But the Press Clause protects everyone, and the use of the press—whether by the news media or anyone else— does not exist only by legislative grace. Just as it would be "dangerous, and unacceptable" to assert that the legislature "could ban political speech of media corporations," *id*. at 351, Hawai'i cannot rescind Grassroot's press rights. *See also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 782 (1978) (press has no "monopoly"); *id*. at 784-85 (power to control what corporations may discuss "is unacceptable").

### 3.    *Act 11 imposes unconstitutional conditions.*

The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech"—thus penalizing the "exercise of those freedoms." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Act 11, however, expressly penalizes the exercise of

13

core First Amendment freedoms. It threatens to dissolve covered entities if they engage in protected political speech, and it conditions foreign corporations' access to Hawai'i on their surrender of their rights. "Such interference with constitutional rights is impermissible." *Id*.

And no exception to the unconstitutional conditions doctrine applies. The state may control the use of a benefit it grants, but it may not use that benefit to completely control the recipient, "effectively prohibiting the recipient from engaging in [any] protected conduct." *Rust v. Sullivan*, 500 U.S. 173, 197 (1991). Yet Act 11 does just that, prohibiting covered entities from engaging in any election or ballot-issue activity.

Because the state attempts to "produce a result which [it] could not command directly," silencing political speech, Act 11 is unconstitutional. *Perry*, 408 U.S. at 597 (quotation marks omitted).

### 4.    *PACs are not a constitutional alternative.*

The state cannot claim that the ability to form political committees can cure the Act's constitutional concerns. First, a "ban on corporate speech," is still unconstitutional, even if "a PAC created by a corporation can still speak." *Citizens United*, 558 U.S. at 337. A PAC remains "a separate association from the

14

corporation," meaning that any asserted option to create one "does not allow corporations to speak." *Id*.

Second, even if a PAC could speak for a covered entity, creating a PAC "does not alleviate the First Amendment problems" with Act 11's speech ban because PACs "are expensive to administer and subject to extensive regulations," making them "burdensome alternatives." *Id*. PACs require new personnel, detailed record-keeping, and regular, extensive reports. *Id*. at 338 (describing burdens). As a result, less than .03% of corporations have PACs. *See id*. at 338-39 (less than 2,000 corporations with PACS, 5.8 million for-profit corporations).

But even if a PAC could speak for a covered entity, and even if it were not a burden, Act 11's prohibition on "directly or indirectly" paying or giving anything of value to support or oppose a candidate or ballot measure would not allow an entity to do so. Act 11, § 4.

Creating a PAC requires resources for donor lists, facilities, and personnel. Federal regulations, for example, thus allow corporations to use their "general treasury monies...for the establishment, administration, and solicitation of contributions to" their PACs, 11 C.F.R. § 114.5(b), and these funds are excluded from the definition of candidate contributions, *id*. § 114.1(a)(2)(iii).

Spending funds for the establishment and administration of a political committee—an organization whose only purpose is "influencing the nomination, election, or defeat of a candidate, or the passage or defeat of a ballot measure," Act 11, § 4—would necessarily fall under any definition of "directly or indirectly engag[ing] in election activity or ballot-issue activity," *id*. Act 11 therefore prohibits covered entities from creating PACs to speak for them.

    C.    Strict scrutiny applies to Act 11's speech prohibitions.

        *1.    Act 11 engages in content-, speaker-, and viewpoint-based discrimination.*

Act 11 trebly triggers strict scrutiny for its content-, speaker-, and viewpoint-based discrimination. "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340. It leaves government "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation marks omitted).

Act 11 "singles out specific subject matter for differential treatment." *Id*. at 169. In deciding what corporate speech it will allow and what it will prohibit, Hawaiʻi targets speech about two "topic[s] discussed," *id*. at 163, candidates and ballot issues. Hawaiʻi's banned topics are *the* "expression at the core of our electoral

16

process and of the First Amendment freedoms," *Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (per curiam) (quotation marks omitted).

The First Amendment further "[p]rohibit[s]...restrictions distinguishing among different speakers" in part because "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340. And that is what we see here. Act 11 singles out and prohibits any effort by most corporations and other entities to "directly or indirectly engage" in two subjects, "election activity or ballot-issue activity." Act 11, § 4.

Act 11 also practices viewpoint discrimination. The point of laws such as Act 11 is to amplify "ordinary citizens' voices" by keeping corporations from sharing their views. Tom Moore, *Undoing* Citizens United *and Reining In Super PACs*, Center for American Progress (Sep. 15, 2025), https://bit.ly/4ugUQ4N, Ex. V. The Act's one exception more deeply entrenches the viewpoint discrimination, allowing corporations to speak only if they share what officials consider to be "bona fide news." Act 11, § 4. By engaging in viewpoint discrimination—"the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker"—the state has committed an even "more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168-69 (quotation marks omitted).

17

*2.    The Act limits—indeed prohibits—election expenditures.*

Furthermore, Act 11 triggers strict scrutiny because limits on election expenditures "operate in an area of the most fundamental First Amendment activities," and in which they "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *McCutcheon v. FEC*, 572 U.S. 185, 196-97 (2014) (Roberts, C.J., controlling op.) (quotation marks omitted). Expenditure limits therefore must "promote[] a compelling interest." *Id*. at 197.

Act 11 is thus "presumptively unconstitutional" unless "the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. The act cannot survive any level of scrutiny, much less strict scrutiny.

D.    Hawaiʻi cannot demonstrate any valid, let alone compelling, interest for Act 11.

The Supreme Court has repeatedly held that the interest in fighting actual or apparent corruption is "the *only* legitimate and compelling government interest[]...for restricting campaign finances," that is, for restricting either expenditures or contributions. *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-497 (1985) (emphasis added) ("*NCPAC*").

The apparent interest behind Act 11 is different: a desire to reduce the money allegedly allowed into public debate by *Citizens United*, and to diminish the

18

ostensible distortions in public debate such money causes. The impetus behind

such laws is to keep "ordinary citizens' voices [from being] drowned out." Moore,

*Undoing* Citizens United, Ex. V. But the Supreme Court has repeatedly rejected

the interests in reducing money in politics and in equalizing influence. Maintaining

or returning to some imaginary optimal speech equilibrium is simply not a

governmental interest that justifies silencing speech.

Restricting "the amount of money a person or group can spend on political

communication during a campaign necessarily reduces the quantity of expression

by restricting the number of issues discussed, the depth of their exploration, and

the size of the audience reached." *Buckley*, 424 U.S. at 19. Act 11 thus imposes a

"substantial…restraint[] on the quantity and diversity of political speech." *Id*. The

First Amendment cannot countenance an interest that contradicts the amendment's

very nature and purposes.

The anti-distortion rationale—based on the alleged interest in equalizing

influence—likewise cannot stand in the face of the First Amendment, which was

"designed to secure the widest possible dissemination of information from diverse

and antagonistic sources, and to assure unfettered interchange of ideas." *Id*. at 49

(quotation marks omitted).

Accordingly, the government cannot use the anti-distortion interest to restrain participation in public debate. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Id*. at 48-49; *see also Davis v. FEC*, 554 U.S. 724, 741 (2008) ("a legitimate government objective"). In the absence of any valid governmental interest, Act 11 fails any level of scrutiny.

E.   Hawaiʻi's speech ban does not further a compelling interest.

Act 11 cannot further the interest in combatting actual or apparent corruption because the anti-corruption interest cannot justify a limit—much less a ban—on independent expenditures. There is "no tendency in such expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption." *NCPAC*, 470 U.S. at 497; *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1118 (9th Cir. 2011) ("anti-corruption interest unavailing"). People expressing their political views through a corporate vehicle does not introduce any quid pro quo corruption or its appearance.

That Act 11 fails to further a compelling interest does not change merely because individuals have joined together and used a corporate or similar form to give voice to their ideas.

20

Nor does the demand that Act 11 further a compelling interest change merely because the state is exercising power over corporations. As Deputy Attorney General Christopher Hahn testified, arguing that the legislature is merely exercising power over corporations "ignores the fact that any exercise of the state's power still has to comport with the limits of the Constitution." *S.B. 2471, Relating to the Powers of Artificial Persons*: Before the House Committee on Judiciary & Hawaiian Affairs, 2025 Leg. (Apr. 8, 2026) (testimony of Christopher Hahn, at 1:08:55).[4] The state could not, without facing constitutional scrutiny, impose as a condition of incorporation that a nonprofit organization stop speaking about native Hawaiian issues, or stop providing services to help only native Hawaiians. Nor could it prohibit law firms from representing distrusted groups; ask corporations to surrender the right against unreasonable searches and seizures; or demand that corporations submit to uncompensated takings. And it could not prohibit organizations from legislative activity; force charities to disclose all their donors; or order media and other corporations to stop using the kahakō and ʻokina, or any other parts of ʻŌlelo Hawaiʻi.

---

[4] Available at
https://www.youtube.com/live/rJwSp7c3HvI?si=JXrv0uAPx213rr3F&t=4043.

21

The underinclusiveness of Act 11's prohibitions further demonstrates that the law does not further a compelling interest. Laws "cannot be regarded as protecting an interest of the highest order" when they "leave[] appreciable damage to" an asserted interest untouched. *Reed*, 576 U.S. at 172 (quotation marks omitted). Nonetheless, Act 11 gives free rein to favored groups to speak about election activity and ballot-issue activity, while prohibiting others.

It allows speech from noncandidate committees—which "are entities created [just] for the purpose of engaging in election activity and ballot-issue activity," Act 11, § 10—while prohibiting independent expenditures from groups that have other purposes. But nothing about having non-political purposes would increase the danger of corruption.

And Act 11 allows corporations with media arms to speak about political activity, while prohibiting political speech from those that don't. The state can point to nothing that would make a giant corporation that owns a newspaper any less corrupting than a small business that does not. Nor can the government argue that the media enjoys some special First Amendment protection that would justify extra protection. *See Lovell*, 303 U.S. at 452; *Citizens United*, 558 U.S. at 390 (Scalia, J., concurring).

22

Act 11's exemptions demonstrate that it "cannot be regarded as protecting an

interest of the highest order," and it therefore "fails strict scrutiny." *Reed*, 576 U.S.

at 172 (quotation marks omitted).

  F.  Act 11 is unconstitutionally vague.

Act 11 is "void for vagueness" because its provisions "trap the innocent by not

providing fair warning" of what is and what is not prohibited speech, *Grayned v.

City of Rockford*, 408 U.S. 104, 108 (1972), and the provisions' lack of standards

"authorizes…seriously discriminatory enforcement." *United States v. Williams*,

553 U.S. 285, 304 (2008). And "[w]here First Amendment rights are involved," as

here, "an even greater degree of specificity is required." *Buckley*, 424 U.S. at 77

(quotation marks omitted).

For fifty years, courts have worked to create clear standards defining what is

advocacy and what is not. Hawaiʻi's campaign finance codes have incorporated

some of those standards. *See* HRS § 11-302 (definition of electioneering

communication, part (1)(C)). Act 11, however, ignores those standards, and instead

proscribes anything that "directly or indirectly" supports or opposes a candidate or

measure. Act 11, § 4.

Using "indefinite" phrases like "'relative to'" and "for the purpose

of...influencing" to regulate speech about candidates "fails to clearly mark the

23

boundary between permissible and impermissible speech." *Buckley*, 424 U.S. at 41, 77. Here, phrases like "directly or indirectly," "support," "oppose," and "bona fide" fail to clearly warn speakers about what activity will trigger Act 11's penalties.

The Act fails to define what it means to support or oppose a candidate or measure. *Buckley* limited the regulation of independent expenditures to language "that in express terms advocate...election or defeat." *Id*. at 44. That would cover words "such as 'vote for,'… [or] 'reject,'" *id*. at 44 n.52, as well as communications "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 470 (2007) (Roberts, C.J., controlling op.). And electioneering communications limit their reach to communications that clearly identify a candidate, when made within 30 days of a primary or 60 days of a general election. *Citizens United*, 558 U.S. at 321; *see also* HRS § 11-302.

Act 11 ignores these standards and just forbids indirectly engaging in any activity that supports or opposes a candidate or measure. Covered entities don't know if the Act's reach is limited to television broadcasts or newspaper ads, HRS § 11-302 (electioneering communication definition), or if it covers even things of

24

de minimis value, like buttons, banners, and bumper stickers. Or if even the staff time to retweet a social media post could trigger enforcement.

Electioneering communications must at least clearly identify a candidate, such as by giving her name or showing her picture, but Act 11 knows no such bounds. Opposing a candidate could include communications that take a strong position on an issue central to a candidate's campaign. And it could apply to an issue communication mentioning an officeholder as soon as she declares her candidacy.

Act 11's vagueness gives regulators vast discretion to go after disfavored speech. And organizations will censor even protected speech to avoid trouble. *See Buckley*, 424 U.S. at 41 n.48. The law is unconstitutionally vague.

G.    Act 11 is unconstitutionally overbroad.

Act 11 should "be invalidated as overbroad" because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks omitted), if it had one.

First, while the government may ban corporate contributions to candidates, *see, e.g.*, *FEC v. Beaumont*, 539 U.S. 146, 149 (2003), it may not "suppress" expenditures made independent of a candidate, *Citizens United*, 558 U.S. at 319.

25

Act 11 sweeps staggeringly beyond direct candidate contributions, banning all expenditures that might support or oppose a candidate or ballot measure.

Second, even assuming that Hawaiʻi did have the authority to limit domestic corporations' speech, the prohibition on out-of-state corporations sweeps far beyond that alleged authority. Out-of-state corporations are organized in other states, which control their corporate charters and the powers they hold.

Act 11 thus runs afoul of "a conflict of laws principle called the 'internal affairs doctrine.'" *Atherton v. FDIC*, 519 U.S. 213, 223 (1997). "Federal courts generally defer to the law of the state of incorporation for issues involving a corporation's internal affairs." *Lee v. Fisher*, 70 F.4th 1129, 1154 (9th Cir. 2023) (quotation marks omitted). Foreign state law would control, for example, "the validity of [a] challenged by-law," *id*. (quotation marks omitted), such as granting powers to speak about ballot measures. *See also In re Ala Moana Props. Ltd.*, 563 P.3d 694 (Haw. Ct. App. 2025) (discussing doctrine); Restatement (Second) of Conflict of Laws, § 302 (1988) ("local law" determines "rights and liabilities").

That has several consequences. It demonstrates that the state's corporate powers justification does not give it authority to define out-of-state corporate powers. Moreover, even under the state's own rhetoric, Act 11 limits powers already given to corporations by other states, restricting rights that have attached to and are

26

exercised using those powers. And the Act thus sweeps well beyond any power even its own theory could claim.

Third, even assuming that the state had an anti-distortion interest, or one in reducing money in elections, that would apply only to very wealthy corporations. But Act 11 "ban[s] the political speech of millions of associations of citizens," where most "are small corporations without large amounts of wealth." *Citizens United*, 558 U.S. at 354.

Finally, even assuming that the state had a governmental interest and that it had plenary power over corporations, any prohibition on unincorporated nonprofit associations is overbroad. By definition, such associations do not require any official act by the state to create them. Rather, the state has defined a "nonprofit association" as "two or more members"—those making decisions—"joined…for a common, nonprofit purpose." HRS § 429-1. No interest could possibly justify prohibiting any group of two or more people from uniting to speak about a ballot or candidate.

Act 11 is facially unconstitutional considering its overbroad applications.

II.    ACT 11 IRREPARABLY HARMS GRASSROOT

"Irreparable harm is relatively easy to establish in a First Amendment case," as a party need only "demonstrate[] the existence of a colorable First Amendment

claim." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (quotation marks omitted). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Grassroot has demonstrated irreparable harm. Act 11 prohibits Grassroot's protected ballot-issue advocacy, and legislative activity that mentions candidates close in time to elections. The Act has prohibited advocacy critical to the goals of the Grassroot Action Center, such that it no longer makes sense to activate the Center. And Act 11 is already harming Grassroot's fundraising, as well as the plans Grassroot can make based on that fundraising. Two donors have already said that they will decrease or refrain from donations because of the Act's restrictions.

III.    THE BALANCE OF EQUITIES, AND THE PUBLIC INTEREST, FAVORS
        GRASSROOT

"Courts have consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1188 (9th Cir. 2021) (quotation marks omitted). Thus, where a First Amendment violation is likely, an "injunction serves the interests of the general public by ensuring that the government's [actions] comply with the Constitution...because all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quotation marks omitted); *see also Rodriguez v.*

28

*Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (no harm in ending "unlawful practice"). Accordingly, "[t]he public interest and the balance of the equities favor" an injunction. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (quotation marks omitted).

IV.        THIS COURT SHOULD ENTER A PERMANENT INJUNCTION

Grassroot requests that the Court exercise its discretion to consolidate the hearing on the preliminary injunction with the trial on the merits. *See* Fed. R. Civ. P. 65(a)(2). So exercising its discretion would be appropriate here, as the "expedited resolution" would make clear Grassroot's rights and remove a cloud over fundraising that will only grow; it would "conserve judicial resources and avoid duplicative proceedings"; this case will "involve[] only legal issues"; and none of the parties will be prejudiced. *Thomas v. Zachry*, No. 3:17-cv-0219-LRH-WGC, 2017 U.S. Dist. LEXIS 75389, at *3 (D. Nev. May 17, 2017) (citing cases). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Flexible Lifeline Sys. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (quotation marks omitted).

Plaintiffs request that bond be waived or set in the amount of $1.00. This Court has discretion to waive the security requirements of Fed. R. Civ. P. 65(c) or require

only a nominal bond. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). "Courts [in the Ninth Circuit] also have denied bond requirements where the plaintiff was pursuing litigation that would vindicate important constitutional rights." *Thomas v. Cty. of Riverside Sheriff's Dep't*, No. EDCV 10-01846 VAP(DTBx), 2011 U.S. Dist. LEXIS 164992, at *80 (C.D. Cal. July 7, 2011) (quotation marks omitted) (compiling cases); *see also L.A. Press Club v. City of L.A.*, 790 F. Supp. 3d 838, 849 (C.D. Cal. 2025) (waiving bond); *E.K. v. DOD Educ. Activity*, 807 F. Supp. 3d 517, 548 (E.D. Va. 2025) ("Ordinarily…waived"). Given that Plaintiffs seek to vindicate important First Amendment rights, the Court should waive the bond requirement or set bond at a nominal amount.

CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Dated: June 19, 2026                          Respectfully submitted,

                                              s/ *Owen Yeates*
                                              Owen Yeates
                                              INSTITUTE FOR FREE SPEECH
                                              1150 Connecticut Ave., NW, Ste. 801
                                              Washington, DC 20036
                                              Local mailing address:
                                                  P.O. Box 31
                                                  55-510 Kamehameha Hwy Ste. 20
                                                  Laie, HI 96762
                                              oyeates@ifs.org
                                              Telephone: 808-470-0506
                                              *Counsel for Plaintiff*

30