Benjamin E. Lowenthal (Haw. Bar No. 8645)
Law Office of Benjamin E. Lowenthal
1001 Bishop Street, Suite 2210
Honolulu, Hawaiʻi 96813
Telephone: (808) 766-8247
Email: benjamin@bellawyer.com

Counsel for Amicus Curiae
The Center for American Progress

In the United States District Court

for the District of Hawaiʻi

| | |
|---|---|
| Grassroot Institute of Hawaii, a Hawaiʻi nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>Anne E. Lopez, in her official capacity as Hawaiʻi Attorney General, and Nadine Ando, in her official capacity as Director of the Hawaiʻi Department of Commerce and Consumer Affairs,<br><br>Defendants. | 1:26-cv-00279-LEK-RT<br><br>Brief of the Center for American Progress as Amicus Curiae in Support of Defendants.<br><br>Hon. Leslie E. Kobayashi |

**Brief of the Center for American Progress as Amicus Curiae in Support of Defendants**

Hearing: October 13, 2026, 2:30 p.m.
Judge: Hon. Leslie E. Kobayashi
Trial Date: None set
Relates to: ECF No. 22 (Defendants' Motion to Dismiss); ECF No. 15 (Plaintiff's Motion for Preliminary Injunction)

## Corporate Disclosure Statement

The Center for American Progress is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# Table of Contents

Corporate Disclosure Statement ..................... ii
Identity and Interest of Amicus Curiae ..................... 1
Summary of Argument ..................... 1
Argument ..................... 3
I. The Statute, Top to Bottom ..................... 3
II. The Design ..................... 14
III. Three Questions of Hawai‘i Law ..................... 15
IV. The Hohfeldian Analysis: Capacity Before Conduct ..................... 18
V. The Remedy That Cannot Be Assembled ..................... 21
VI. Standards of Review, and Where the Burden Sits ..................... 22
VII. 1977 ..................... 28
Conclusion ..................... 31
Certificate of Compliance ..................... 31
Certificate Regarding Use of Generative Artificial Intelligence ..................... 33
Certificate of Service ..................... 33

# Table of Authorities

## Cases

*Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519 (1839) .......... 8
*Buckley v. Valeo*, 424 U.S. 1 (1976) .......... 22, 30
*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .......... 27
*Chiles v. Salazar*, 607 U.S. 607 (2026) .......... 26
*Citizens United v. FEC*, 558 U.S. 310 (2010) .......... passim
*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) .......... 21
*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) .......... 27, 28, 29, 30
*Greenwood v. Freight Co.*, 105 U.S. 13 (1882) .......... 15
*Hamilton Gas Light & Coke Co. v. Hamilton City*, 146 U.S. 258 (1892) .......... 15, 24
*Leavitt v. Jane L.*, 518 U.S. 137 (1996) (per curiam) .......... 13
*Lehman Bros. v. Schein*, 416 U.S. 386 (1974) .......... 16
*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .......... 25
*Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1869) .......... 8
*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......... 22
*Terral v. Burke Construction Co.*, 257 U.S. 529 (1922) .......... 25
*Tomlinson v. Jessup*, 82 U.S. (15 Wall.) 454 (1873) .......... 15
*Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819) .......... 23
*Webster v. Fall*, 266 U.S. 507 (1925) .......... 29

## Constitutional Provisions

Haw. Const. art. I, § 21 .......... passim

## Statutes

2026 Haw. Sess. Laws Act 11 .......... passim
52 U.S.C. § 30101(9)(B)(i) .......... 5
Haw. Rev. Stat. § 1-8 .......... 12
Haw. Rev. Stat. § 414-3 .......... 4, 5
Haw. Rev. Stat. § 414-41 .......... 6
Haw. Rev. Stat. § 414-42 .......... passim
Haw. Rev. Stat. § 414-44 .......... 9
Haw. Rev. Stat. § 414-435 .......... 7

Haw. Rev. Stat. § 414D-2 ....................23
Haw. Rev. Stat. § 414D-52 .................... 5, 10, 16, 25
Haw. Rev. Stat. ch. 412....................4
Haw. Rev. Stat. ch. 414D....................16
Haw. Rev. Stat. ch. 425....................10
Haw. Rev. Stat. ch. 429....................10

**Regulations**

11 C.F.R. § 100.132 ....................5

**Rules**

Haw. R. App. P. 13 ....................16

**Other Authorities**

Restatement (First) of Property §§ 1–4 (1936)....................18
Wesley Newcomb Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16 (1913)....................18

## Identity and Interest of Amicus Curiae

The Center for American Progress (CAP) is a nonprofit policy institute dedicated to improving the lives of Americans through progressive ideas and action. CAP Senior Fellow Tom Moore is the author of the Corporate Power Reset, the legal framework Act 11 implements. The complaint establishes as much: it quotes amicus's published work as evidence of the Act's purpose.[1]

The author of a design is best positioned to explain what was designed, and this brief is submitted in that capacity: to describe what kind of statute Act 11 is and why the complaint's analytical frame does not fit it.

## Summary of Argument

Act 11 does not regulate the *exercise* of corporate power. It defines the *scope* of corporate power.

For roughly a century, no American statute has approached corporate political spending from the power-granting side. Every case the complaint cites arose from the other direction: a government imposing duties on corporations

---

[1]No counsel for a party authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund its preparation or submission. No person other than amicus curiae or its counsel contributed money intended to fund the preparation or submission of this brief.

already empowered to spend. When a state instead redefines the grant, everything changes: the body of law, the questions, the standards, the remedies. This brief maps that terrain.

The map begins with a simple fact: No state is required to create the corporate form at all. The form is not a constitutionally mandated channel for anything — not commerce, not expression, not association, not electoral participation. Every count is therefore a theory of compelled state design: each asks this Court to hold that the First Amendment obliges Hawaiʻi to include one particular capacity in the artificial persons it creates.

That is not the law. American law runs this subject as a relay. Corporation law runs the first leg: it creates the entity and defines its capacities. Constitutional law runs the second: it protects the speaker it receives. The Supremacy Clause governs collisions, and amicus concedes its full force. But a handoff is not a collision. One rule is key: under reserved-powers doctrine the state may restart the race whenever it chooses. For competitive, not legal, reasons, states granted powers in the broadest terms a century ago, so modern courts have only ever watched the second leg run. Act 11 hauls everyone back to the starting line. Amicus addresses the antecedent question and takes no position on doctrines that arise only if it is answered the other way.

## Argument

### I. The Statute, Top to Bottom

This Part reports what each provision in the Act does and does not do. The reader is invited to attempt what amicus submits cannot be done: *As to the plaintiff, find the prohibition.*

Each entity form in Hawai‘i’s code has its own chapter; Act 11 repeats its design 11 times. This table annotates the unique provisions.

| *The enacted text* | *What it does* |
|---|---|
| **§ 1: Findings** | |
| • “[A]ll political power in the State is inherent in the people”;<br>• the creation of an entity “is a privilege granted by the State, not a natural right”;<br>• under article I, section 21, “no grant of special privileges or immunities is irrevocable and the legislature retains full authority to redefine or withdraw any corporate or entity powers that the State has conferred”;<br>• “these political spending powers were never intended to be among the powers granted”; and<br>• the Act “does not regulate any natural person’s rights to speech, petition, or association” but “simply defines and limits the powers that the State confers.” | The design: State authority sets the powers; rights attach to powers and stay where they reside, with natural persons. This is the State’s motive for the redesign. |

| *The enacted text* | *What it does* |
|---|---|
| **§ 2: Scope** | |
| The Act "applies to all entities organized under the laws of this State unless expressly identified in statute as a public body corporate and politic," and does not apply to "any agency or instrumentality of the State or its political subdivisions." | Every artificial person Hawai'i creates, without exception by entity type, purpose, size, or viewpoint, except the State's own instrumentalities. |
| **§ 3: Chapter 412: Credit unions** | |
| "A credit union chartered under this part shall be subject to section 414-42 with respect to the limitations on corporate powers contained in that section." | The Act's first operative move: a one-sentence cross-reference to a section it rewrites three sections later. |
| **§ 4: Section 414-3: Granted powers** | |
| "'Artificial-person powers' means the same powers as an individual to do all things necessary or convenient to carry out the corporation's lawful business and affairs, excluding any power to directly or indirectly engage in election activity or ballot-issue activity."<br>"'Charter privilege' means any benefit that exists only because the State confers it on a corporation or other entity, including, without limitation, limited liability, perpetual duration, succession in the corporate name, | The description of the powers Hawai'i now affirmatively grants to its artificial persons. Everything necessary and convenient, not to include spending in politics. |

| *The enacted text* | *What it does* |
|---|---|
| business or statutory trusts, and tax credits or abatements." | This section also defines "charter privilege," on which the political-committee grant at § 414D-52(g) turns. |
| **§ 4: Section 414-3: Powers not granted** | |
| "'Election activity' means paying, contributing, or expending money or anything of value to support or oppose a candidate, political committee, or political party," excluding "any bona fide news story, commentary, or editorial distributed through the facilities of" a broadcaster or any print, online, or digital publication, "unless the . . . facility is owned or controlled by a candidate, political committee, or political party."<br><br>"Ballot-issue activity" is defined in parallel and reaches only questions "formally certified or submitted to the electors." | Defines election activity and ballot-issue activity, the two powers not included in the definition of artificial-person powers.<br><br>Media activity **(note: not media *corporations*, as plaintiff alleges)** had to be either included in these definitions or excluded from them; Hawai'i excluded it. The language mirrors the federal definitions at 52 U.S.C. § 30101(9)(B)(i) and 11 C.F.R. § 100.132. |

| *The enacted text* | *What it does* |
| --- | --- |
| **§ 5: Section 414-41(a): Corporate purpose** | |
| "Every corporation incorporated under this chapter has the purpose of engaging in any lawful business, not including election activity or ballot-issue activity.... Under no circumstances shall any power or activity related to election activity or ballot-issue activity be deemed necessary or convenient for a corporation's lawful business purpose or affairs." | Addresses how the capacity entered the old grants — by construction. A general grant can be construed to include a power; a grant defined to exclude one cannot. |
| **§ 6: Section 414-42(a): Conditional grant** | |
| "The creation and continued existence of a corporation shall not be deemed a right but shall be a conditional grant of legal status by this State and shall remain subject to complete withdrawal at any time." | Describes the conditional nature of the powers that Hawai'i grants corporations. |
| **§ 6: Section 414-42(b): Absence of capacity** | |
| "Beginning July 1, 2027, a corporation operating under the jurisdiction of this State shall not have the power to expend moneys on or participate in any election activity or ballot-issue activity." | "Shall not have the power" is a defining term, not a regulating term. It is not addressed to conduct, and it commands no one. |
| **§ 6: Section 414-42(c): The power grant** | |

| *The enacted text* | *What it does* |
|---|---|
| "Unless its articles of incorporation provide otherwise, every corporation . . . shall have perpetual duration and succession in its corporate name and . . . shall have artificial-person powers, including, without limitation, the power to:...." [Fifteen example powers follow, unchanged from prior law.] | The Act's operative provision. It affirmatively grants artificial-person powers to artificial persons. |
| **§ 6: Section 414-42(d): Private drafting** | |
| "Any provision of the articles of incorporation, bylaws, or other organizational documents of the corporation purporting to grant or confer any power to directly or indirectly engage in election activity or ballot-issue activity shall be void." | What the State declines to confer, incorporators cannot confer on themselves. |
| **§ 6: Section 414-42(e): Ultra vires** | |
| "Any act undertaken by a corporation that constitutes an election activity or ballot-issue activity shall be ultra vires and void. A corporation that exercises any power in violation of this subsection may be subject to any applicable sanctions or penalties pursuant to section A-1." | The consequence of acting outside the grant is the usual ultra vires consequence: the act is ultra vires and void. Not forbidden, not illegal — *void.* |
| **§ 6: Section 414-42(f): Parity for foreign entities** | |
| "A foreign corporation shall have no greater rights or privileges than, and shall be subject to the same duties, restrictions, penalties, and liabilities | Hawai‘i does not merely recognize a corporation chartered elsewhere; it |

| *The enacted text* | *What it does* |
|---|---|
| as, a domestic corporation as provided in section 414-435." | *empowers* it to act here. A corporation has no legal existence beyond the sovereignty that created it, and acts elsewhere on the host state's terms. *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 588 (1839); *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 181 (1869). The plaintiff, in any event, is a Hawai'i nonprofit corporation. Compl. ¶ 3. |
| **§ 6: Section 414-42(f): Transacting business** | |
| "A foreign corporation that . . . directly or indirectly undertakes, finances, or directs election activity or ballot-issue activity in the State shall be conclusively deemed to be transacting business in the State." | A registration rule. An entity chartered elsewhere that spends in Hawai'i's elections is transacting business in Hawai'i; it takes the same terms as every other foreign entity doing business here. |
| **§ 6: Section 414-42(f): All or nothing** | |

| *The enacted text* | *What it does* |
| --- | --- |
| "If a final judgment, no longer subject to appeal, . . . limits, invalidates, or enjoins the operation of this subsection, in whole or in part, in any respect, . . . then the entirety of Act [11] . . . shall be deemed invalid and have no force or effect." | Enacted against a concern that the domestic architecture might stand while foreign-entity parity fell. The concern was misplaced — a state's authority over the powers exercised within it is not weaker as to guests than as to its own creations. |
| **§ 7: Section 414-44(d): Ultra vires procedure** | |
| The ultra vires procedure section "shall not apply to acts that constitute election activities or ballot-issue activities, which are ultra vires and void pursuant to section 414-42(e)." | Corporate codes ordinarily insulate completed corporate action from capacity challenges. The Act lifts that insulation for the one category the grant excludes — and confirms the mechanism in doing so. |
| **§§ 8–11 and 17–22: Other entities** | |
| These sections enact the same design for nonprofit corporations, limited partnerships, limited liability companies, and unincorporated nonprofit associations. §§ 12–15 reach professional corporations and three cooperative | |

| *The enacted text* | *What it does* |
| --- | --- |
| forms by cross-reference. Chapter 429 confers the association's conveniences — entity title, suit in the association's name, the member shield. The natural reading confines the Act's association provisions to entities holding those conveniences; whether that reading is correct is a question for Hawai'i's courts. Two people pooling fifty dollars as individuals hold nothing the Act addresses on any reading. | |
| **§ 10: Section 414D-52(g): Political committees** | |
| "[C]andidate committees and noncandidate committees . . . are entities created for the purpose of engaging in election activity and ballot-issue activity and are hereby granted the power to engage in those activities; provided that the committees exist solely for those purposes and claim no charter privilege other than limited liability. No other corporation organized under this chapter shall be granted or shall exercise any power to engage in election activity or ballot-issue activity." | Political-spending power is granted to the entity built to exercise it: political committees. The one privilege the committee keeps — limited liability — is itself a discretionary grant: no constitution requires it, Hawai'i extended it anyway, and withholding it would burden no right of speech or association. |
| **§ 16: Chapter 425: Limited liability partnerships** | |

| *The enacted text* | *What it does* |
|---|---|
| "A partnership registered as a limited liability partnership under this subpart shall not directly or indirectly engage in election activity or ballot-issue activity," and any such act is "ultra vires and void." | The one place the Act speaks in a conduct-shaped verb — but it applies "only to partnerships registered as limited liability partnerships," the registration that confers the shield, and its consequence is the Act's uniform one: voidness, entity-level; no sanction on a human's speech. Partnerships declining the shield are untouched. |
| **§§ 23–24: Chapters A and B: Ultra vires consequences** | |
| "The attorney general or the director of commerce and consumer affairs may impose penalties or bring an action, as applicable, for an ultra vires act": temporary suspension of authority to operate; exclusion from state procurement; revocation of state tax-exempt status; noncompliant-entity designation or additional reporting; revocation of the charter or certificate; involuntary dissolution. | Every consequence is triggered by an ultra vires act, operates on corporate status and capacity, and runs through the business-entity titles under the Attorney General and the corporate regulator. Nothing here punishes a natural person. |
| **§ 25(a): Ordinary severability** | |

| *The enacted text* | *What it does* |
|---|---|
| "If any provision of this Act, or its application to any person or circumstance, is held invalid or unconstitutional, the remaining provisions and applications that are severable shall remain in effect." | |
| **§ 25(b): Non-revival** | |
| "A power, privilege, or capacity that this Act does not confer . . . may not be reviewed, revived, reinstated, implied, or deemed conferred by operation of law or judicial construction." | A power the Act declines to grant cannot be restored. The bar runs to the power, not the mechanism; it blocks every route back.<br><br>Hawai'i's default runs the same way — a repealed law revives only if the legislature clearly says so. HRS § 1-8. Section 25(b) is the legislature saying the opposite, equally clearly. |
| **§ 25(c): Inseverability** | |
| "Notwithstanding subsection (a), if any provision of this Act is held invalid, no provision . . . shall be construed, severed, or applied to confer, recognize, revive, reinstate, or imply any power of an artificial person to engage in election activity or ballot-issue activity. If invalidation . . . would | Severability turns on what the legislature would have preferred. This legislature answered. If invalidating any provision would leave a class of |

| *The enacted text* | *What it does* |
|---|---|
| otherwise result in an artificial person acquiring, retaining, reviving, or being deemed to possess any power to engage in election activity or ballot-issue activity, the grant . . . to the affected class of artificial persons . . . is inseverable from the invalid provision and shall have no force or effect. The legislature would not have enacted any grant . . . that includes any power to engage in election activity or ballot-issue activity.” | entities holding the political-spending power, the entire grant to that class falls — no powers at all rather than that one.<br><br>Severability is a question of state law. A federal court’s view of what a legislature would have wanted yields to what the legislature said. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). |
| **§ 27: Effective date. “This Act shall take effect on July 1, 2027.”** | |

If Act 11 is not a corporate-powers statute, what would one look like? Suppose Hawai‘i wished to withdraw the corporate capacity to issue bearer shares. It would amend the powers grant, define the excluded capacity, make contrary acts ultra vires, and attach consequences to corporate status, chapter by chapter, inside the entity code. It would look just like Act 11.

## II. The Design

Imagine the drafters of a state's first corporation statute working from a blank sheet. They list powers: hold property, contract, sue and be sued, and so forth. One drafter asks whether the list should include treasury-funded election spending. The other says: "No! That's a terrible idea! We don't want corporations to have that." They leave it out. What just happened? A motive was stated. A design decision was made.

Motive is inherent to entity design. Every capacity must be either included or excluded, and every choice has a reason. At the design moment there is no speaker, no exercise, and no burden: regulation asks, "May this speaker exercise this power?"; design asks, "What powers shall this speaker possess?" "We do not confer the power to spend in politics" describes the instrument being built, no more suspect than "we do not confer the power to issue bank notes." A justification is owed to no one because the design moment acts on no one.

The judgment behind Hawai‘i's version is structural. The privileges the State confers — limited liability, perpetual existence, entity shielding, and centralized management — converge into something particular: an aggregated, shielded, centrally directed treasury. Hawai‘i may conclude that election-spending capacity does not belong in that bundle. The political committee provision carries the judgment forward.

What of already-existing entities, like the plaintiff? This is straight reserved-powers doctrine. Every entity formed under Hawaiʻi law carries from formation the condition that makes Act 11 possible: the grant is revisable at the State's discretion. The authority to set the terms is the same authority that resets them. In Hawaiʻi the term is constitutional, art. I, § 21: no legislature could promise permanence, and no incorporator could acquire it. The reservation is in the grant from the day it issues; an amendment made under it is the grant operating as written. *Tomlinson v. Jessup*, 82 U.S. (15 Wall.) 454, 457–58 (1873).

Act 11's findings are explicit: the State does not want corporations spending in its politics. Written into a speech regulation, that sentence would end the case — it is the antidistortion interest that *Citizens United* rejected. Written into a powers statute it is unremarkable, and irrelevant to this Court's review. The State may exercise its reserved authority "whatever may be the motive of the legislature, or however harshly such legislation may operate," *Hamilton Gas Light & Coke Co. v. Hamilton City*, 146 U.S. 258, 270 (1892), and the legislature "need give no reason for its action in the matter," *Greenwood v. Freight Co.*, 105 U.S. 13, 17 (1882).

## III. Three Questions of Hawaiʻi Law

The constitutional merits reduce to three questions of Hawaiʻi law: how far the Act's defined terms reach, what the amended grant now contains, and what

Hawaiʻi's grant of corporate powers can contain at all. No Hawaiʻi court has been asked any of them; only the Hawaiʻi Supreme Court can settle them. Certification requires no motion from any party; the decision rests in this Court's sound discretion. *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974); *see* Haw. R. App. P. 13(a), (c).

This friend of the Court warmly recommends having them settled before any federal question:

1. Do "election activity" and "ballot-issue activity," as Act 11 defines them, reach expenditures for lobbying, issue advocacy, or commentary concerning officeholders or candidates, or expenditures concerning a ballot question before it has been formally certified or submitted to the electors?
2. Under chapter 414D as amended, does a nonprofit corporation that is not a § 414D-52(g) committee possess, among the powers the State confers, the power to engage in election activity or ballot-issue activity?
3. Where article I, section 21 provides that the State's power to act in the general welfare "shall never be impaired by the making of any irrevocable grant" of special privileges or immunities, may a general grant of corporate powers be construed to contain a power the State

may not later withdraw — whatever the basis asserted for the non-withdrawability?

Counts Two through Five turn on the first question. The second question determines whether Act 11 removes anything from this plaintiff at all. The second and third together determine not the judgment this Court must make, but its effect: If political-spending power is revocable, Act 11 revokes it; if it is irrevocable, can that power even be included in the grant in the first place? Either way, plaintiff does not hold the power.

Those questions are not merely unsettled; they are logically antecedent to every federal question in the complaint. Before deciding whether the First Amendment protects a corporate power, this Court should know whether Hawaiʻi law grants that power at all.

Plaintiff's own filings make the case. Its vagueness count catalogs unsettled questions of Hawaiʻi law — whether the defined terms reach issue advocacy, officeholder commentary, or de minimis items — and its declarations document conduct whose coverage no Hawaiʻi court has determined: lobbying, issue advocacy, published commentary. Each is a reason for an authoritative construction, and the July 1, 2027 effective date leaves ample time to obtain one before anyone is subject to it.

**IV. The Hohfeldian Analysis: Capacity Before Conduct**

A century ago, Wesley Newcomb Hohfeld observed that lawyers routinely collapsed distinct legal relations under the single word *right*, obscuring analysis. Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16 (1913). The American Law Institute adopted his framework in the Restatement (First) of Property §§ 1–4 (1936). The framework has endured because different legal relations trigger different bodies of law. Sorting them correctly determines which law governs.

This case turns on two of Hohfeld's legal relations. The first concerns **capacity**: what legal powers an actor possesses. The second concerns **conduct**: given those powers, what the actor may do. They arise in sequence because conduct rules presuppose capacity: before the law can ask whether a corporation may spend in an election, there must be a corporation capable of making the expenditure as a corporate act. That question belongs to corporation law; only after the state defines the capacities can constitutional law ask whether their exercise may be restrained.

Act 11 operates at that first stage. A corporation has no natural existence and no inherent legal powers. It exists because the state creates it, and it possesses only those legal capacities the state confers. Hawai‘i decides whether a corporation may own property, contract, sue and be sued, merge, dissolve, and act through officers.

If a power is omitted from the grant, the corporation simply lacks it. Hohfeld called that absence a **disability**. Act 11 therefore does not regulate the exercise of corporate power. It defines the **scope** of corporate power. It answers the antecedent question — "Is political spending among the powers Hawaiʻi grants?" — and its answer is "No."

Only then does constitutional law enter the picture. Once a corporation exists with a defined set of legal powers, it may hold constitutional **immunities** against certain governmental acts. That was *Citizens United*. No one disputed that the corporation possessed the power to make an independent expenditure; Congress prohibited its exercise; the Court held the First Amendment protected the corporation against the prohibition. In Hohfeldian terms, the corporation held an immunity, and Congress was correspondingly disabled.

The Hohfeldian relation at the first stage is different. Hawaiʻi holds, *and has always held,* the power to define and, under its reserved authority, redefine the capacities of its corporations. The corporation holds, *and has always held,* the corresponding liability: its capacities are subject to that exercise of state power.

The complaint asks this Court to move that immunity backward one step, asserting that the First Amendment requires Hawaiʻi to grant a corporation political-spending power when the corporation is created.

That does not follow. Immunities protect the exercise of granted powers; they cannot require the State to grant them. The theory mistakes an immunity protecting the exercise of corporate power for an entitlement compelling its creation.

Plaintiff answers with aggregate theory. But aggregate theory is how courts read statutes that govern corporations already created. Act 11 defines them. A theory about what corporations are does not amend what the legislature conferred.

The plaintiff cannot derive entitlement to a power from the proposition that, *if it held the power,* the First Amendment would protect its exercise. That is the difference between challenging a speed limit and demanding that every car be built to go 200 MPH. The first contests a restriction on an existing capacity; the second demands that the capacity be supplied.

The complaint therefore begins its analysis one step too late. Every allegation that Act 11 "bans," "penalizes," or "prohibits" protected speech assumes the proposition the plaintiff must prove — that the corporation already possesses political-spending power. It treats a law defining capacity as a law regulating conduct. *Citizens United* spoke only to the second question. Act 11 lives in the first.

## V. The Remedy That Cannot Be Assembled

The remedial problem follows from the Hohfeldian one: a disability in the State is not a power in the corporation.

In every speech case the complaint cites, relief is subtraction, and subtraction works because it restores. Enjoin the enforcer, declare the provision invalid, sever the clause. The prior status quo returns because the plaintiff's capacity predated the statute and sat beneath it.

Here there is nothing to restore. The capacity the plaintiff wants back was never a freestanding legal position; it was a construction of a general grant, and the legislature has redefined that grant. Run the tape, arguendo and at full scope. Enjoin the Attorney General and the Director. The next morning, the definitions still read as enacted. The grant still contains what it contains. Directors who authorize the expenditure still act beyond the grant, and the non-revival provision still instructs every court construing Hawai‘i law that the omitted power may not be implied. The entity is not enjoined-yet-defiant, and it is not barred. It is without the power.

Nor can the gap be closed by decree. A federal court may disable Hawai‘i from enforcing a rule. It cannot declare valid what Hawai‘i law makes void, or construe a definition to mean the opposite of what the legislature enacted. Federal courts apply state law; they do not write it. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64,

78 (1938). Courts hold an eraser, not a pen, and there is no prohibition here to erase. Note that if Hawai‘i repealed its entity chapters outright, no court could order the corporations back into existence. The gap here is the same gap, smaller.

The misfit is itself evidence. Regulatory statutes arrive with regulatory remedies attached; when every remedy in the familiar kit closes on nothing, the Court is facing a different kind of statute — the kind whose content two centuries of precedent commit to state discretion.

**VI. Standards of Review, and Where the Burden Sits**

First Amendment standards do not determine whether Act 11 regulates protected conduct; they apply only after that predicate is established. Strict scrutiny governs restrictions on independent expenditures; "closely drawn" scrutiny governs contribution limits. *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976) (expenditures); *id.* at 23–25 (contributions). Exacting scrutiny governs disclosure. *Id.* at 64. Content-based restrictions trigger their own rules. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Amicus disputes none of that. But each doctrine begins with an actor possessing the capacity to act and government restraining its exercise; none supplies the capacity its application presupposes.

*Reed* does not change the analysis. It governs content lines drawn within an existing expressive capacity; Act 11 defines the capacity itself — political

spending is a transactional capacity of its own, not a message within a broader granted power. The limiting principle is straightforward: a state may define an artificial person's powers, but may not carve disfavored messages from a power already granted or use entity design to burden natural persons' independent constitutional rights. Act 11 does neither.

In the powers domain, the reserved-powers doctrine supplies the rule of decision. The doctrine begins with *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), which treated a corporate charter as a contract protected from impairment. States answered by reserving, in the grant itself, authority to amend, alter, or repeal what they had granted. Has Hawaiʻi reserved that authority? Yes, twice over. The statute governing this plaintiff provides that "[t]he Hawaii legislature has power to amend or repeal all or part of this chapter at any time," and every corporation subject to the chapter "is governed by the amendment or repeal." Haw. Rev. Stat. § 414D-2. Hawaiʻi's Constitution reinforces the reservation: "[t]he power of the State to act in the general welfare shall never be impaired by the making of any irrevocable grant of special privileges or immunities." Haw. Const. art. I, § 21.

Once that reservation is identified, the corporation's powers have been held subject to it from the beginning. *Hamilton Gas Light* explains the consequence: where the reservation applies, a later alteration "cannot be regarded as one

impairing the obligation of the contract." 146 U.S. at 270. The reservation is not a factor to balance against some pre-existing corporate entitlement. It is part of the grant that *defines* the entitlement.

That does not make corporation law immune from independent constitutional limits. It means that reserved-powers doctrine does not invite further inquiry into whether Hawaiʻi had a sufficiently good reason to revise its grant. The State reserved the power; this corporation took subject to it; Act 11 exercises it. Unless an independent constitutional rule forbids the particular redefinition, the reserved-powers inquiry is complete.

The analysis must also keep the rights-holder straight. The plaintiff cannot take the corporation from one side of the ledger and the constitutional rights of natural persons from the other. If the rights-holder is the corporation, the plaintiff must identify a corporate capacity independent of the State's grant that Act 11 burdens. If the rights-holders are the natural persons who form, fund, or associate through it, Act 11 takes no right from them.

The same point defeats an unconstitutional-conditions theory. That doctrine requires a rights-holder who already possesses the asserted right and surrenders it as the price of a government benefit; the rights-holder, the right, and the condition must line up in the same legal person. *Terral v. Burke Construction Co.*, 257 U.S. 529, 532–33 (1922), is the genuine article: an independent federal right — access

to federal court — conditioned on corporate permission, and the condition fell. The corporation's political-spending capacity is not independent of state law and has always been subject to Hawai'i's reserved authority. The natural persons, meanwhile, surrender no constitutional right as the price of incorporation. The plaintiff cannot combine the corporation's legal status with the natural persons' constitutional rights and call the result an unconstitutional condition.

The complaint's associational count invokes a different structure: an entity may assert its members' rights when it is the medium through which they make their expression effective. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958). The assertion is licensed and bounded: it supplies a speaker, not a new right, and the claim rises no higher than the members' own — which are whole. Every natural-person capacity survives Act 11 untouched — speaking, spending, associating, pooling funds, including through the vehicle the Act designs for the purpose: a noncandidate committee expressly granted election capacity. Haw. Rev. Stat. § 414D-52(g). What the members seek is different in kind: that the instrument the State supplies carry the power to deploy pooled entity assets in elections. Amicus is aware of no case locating that increment inside the right of association, and if Hawai'i repealed its entity chapters outright, the members' associational rights would survive undiminished — those rights never contained the form's toolkit. Nor is any line drawn against these members: the definitions run to every

artificial person and every viewpoint alike. Remedy confirms the diagnosis: the injunction the count could obtain reaches enforcement, not capacity, and relief that leaves the activity itself inoperative reveals what the count requires — conferral. See Part V.

The complaint's remaining theories require the same sequencing. Each presupposes that Act 11 does something to a capacity the plaintiff holds. What Hawaiʻi law gives the entity, and what Act 11 does to that grant, are questions of Hawaiʻi law that no Hawaiʻi court has answered. See Part III.

The injunction papers answer with *Chiles v. Salazar*: "The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by mere labels." 607 U.S. 627, 645 (2026). Amicus agrees. The Court should take no label at face value, including the State's, and should ask what legal relations the enacted words create. The inquiry cuts both ways. A definition does not become a "ban" because the complaint calls it one; an ultra vires consequence does not become a speech "penalty"; and the absence of a corporate power does not become a restraint on its exercise. *Chiles* requires substance over labels; that is the inquiry Act 11 demands.

Authorities within the plaintiff's own canon expose the missing premise. Justice Scalia's *Citizens United* concurrence distinguished the questions directly: "even if the common law was 'generally interpreted' to prohibit corporate political

expenditures as ultra vires, that would have nothing to do with whether political expenditures that were authorized by a corporation's charter could constitutionally be suppressed." 558 U.S. 310, 389 n.5 (2010) (Scalia, J., concurring). Charter authorization is the premise of the constitutional question. The concurrence separates exactly the questions the plaintiff merges: whether the corporation is authorized to make the expenditure and whether government may suppress an expenditure that is authorized.

*Burwell v. Hobby Lobby Stores, Inc.* makes the same point from the majority side. Justice Alito stated the predicate directly: "the objectives that may properly be pursued by the companies in these cases are governed by the laws of the States in which they were incorporated" — and those laws, he continued, "permit for-profit corporations to pursue 'any lawful purpose' or 'act,' including the pursuit of profit in conformity with the owners' religious principles." 573 U.S. 682, 713 (2014). State law first supplied capacity; federal law then determined what protection attended its exercise.

The burden remains with the plaintiff, under the law that exists now. Nothing in *Citizens United*, *Bellotti*, or any other decision holds that the First Amendment requires a state to confer political-spending power on the artificial entities it creates. Extending those cases to that antecedent question would be a new doctrinal step, not an application of existing precedent.

**VII. 1977**

Suppose that in 1977, Hawaiʻi's grant did not include the power to spend in politics. Then, in 1978, *Bellotti* strikes down a Massachusetts restraint on the ballot-measure spending of corporations already empowered to spend. Hawaiʻi's entities hold no such capacity; nothing in *Bellotti* operates on them.

*Citizens United*, 2010: the same. It protects the exercise of existing capacity against a federal criminal restraint, and Hawaiʻi's entities have none to exercise. Nobody in 1978, and nobody in 2010, would have argued that either decision silently required Hawaiʻi to amend its corporation code. Indefensible then; the plaintiff's entire case now.

The listener-interest strand changes nothing: the public's right to receive speech attaches to speech lawfully available; it does not oblige a state to build speakers. *See Bellotti*, 435 U.S. at 783. If Hawaiʻi abolished its corporations outright, every corporate voice would fall silent, and no listener could state a claim.

Nor did *Bellotti* decide the question presented here, and the proof is on its own record. Two of *Bellotti*'s five appellants were national banks, holders of enumerated federal charters — one of them gives the case its name. No party asked whether the appellants' grants included the power they were exercising, and the Court did not rule on it. Questions that "merely lurk in the record, neither brought

to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

Consider what a court would have to hold, newly in each instance, to sustain the complaint:

- That declining to confer a corporate power is suppression of speech.
- That political-spending capacity, alone among corporate powers, is a constitutionally mandatory attribute of every artificial person a state creates.
- That the reserved-powers doctrine contains a First Amendment exception no case has recognized.
- That an immunity against governmental restraint can require a state affirmatively to confer the underlying corporate power.

Each proposition would be new. None has a case behind it.

Even then, the Court would not be finished. It would confront article I, section 21, which provides that the State's power to act in the general welfare "shall never be impaired" by any irrevocable grant of special privileges or immunities. If the First Amendment makes political-spending power immune from withdrawal, then on the plaintiff's theory the act of granting the power carried the legal consequence that the State could never withdraw it, the precise impairment section 21 says shall never occur. Hawaiʻi law raises the antecedent question

whether such a power could have entered the grant at all. That is Hawai‘i’s question to answer first.

The asymmetry is stark. To sustain Act 11, this Court need only reaffirm the foundational corporation-law principles the Supreme Court has applied for two centuries. States create corporations, define their powers, and may reserve authority to alter those powers later. Corporate-law cases continue to govern corporate powers; *Buckley*, *Bellotti*, and *Citizens United* continue to govern restrictions on political spending by speakers already empowered to spend. Nothing is overruled, narrowed, extended, or displaced.

To sustain the complaint requires the opposite. The Court would have to extend First Amendment campaign-finance doctrine into the antecedent power-granting domain, constitutionalize political-spending power as a mandatory attribute of the corporate form, carve out a First Amendment exception to Hawai‘i’s reserved authority, and fashion a remedy capable of supplying a power the legislature withheld.

That is the asymmetry. Hawai‘i asks this Court to reaffirm 200 years of corporation law. The plaintiff asks it to create new constitutional law.

## Conclusion

Act 11 should be adjudicated as what it is: an exercise of Hawai‘i’s authority to define the artificial persons it creates. Amicus respectfully urges the Court to resolve the pending motions within that frame.

Dated: September 11, 2026.

s/ Benjamin Lowenthal
Benjamin E. Lowenthal
Counsel for Amicus Curiae
The Center for American Progress

## Certificate of Compliance

Pursuant to LR7.4(e), I certify that the foregoing brief is in 14-point Times New Roman, double-spaced, and contains 6,249 words, exclusive of the case caption, tables of contents and authorities, and certificates, as counted by the word-processing system used to produce it, in compliance with LR7.4(b) and (d).

s/ Benjamin Lowenthal
Benjamin E. Lowenthal
Counsel for Amicus Curiae
The Center for American Progress

## Certificate Regarding Use of Generative Artificial Intelligence

Pursuant to the Disclosure and Certification Requirements — Generative Artificial Intelligence issued by the Chambers of United States District Judge Leslie E. Kobayashi, and consistent with Rule 11(b) of the Federal Rules of Civil Procedure, the undersigned discloses that a generative artificial intelligence tool (Claude, developed by Anthropic, PBC) was used in the preparation of portions of this brief. The undersigned certifies that counsel has checked the accuracy of every portion of this document drafted with the assistance of generative artificial intelligence, including all citations and legal authority.

s/ Benjamin Lowenthal
Benjamin E. Lowenthal
Counsel for Amicus Curiae
The Center for American Progress