Joseph A. Gomes, Esq., AAL LLC (HI Bar No. 6789)
1170 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii 96837
Telephone: (808) 780-4179
Email: joegomesesq@gmail.com

Brian Hauss*
Ken Sexauer*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: bhauss@aclu.org
Email: ksexauer@aclu.org

Counsel for Amicus Curiae American Civil Liberties Union

* *Pro hac vice* applications forthcoming

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAIʻI , a Hawaiʻi nonprofit corporation,<br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Hawaiʻi Attorney General, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br>Defendant. | Civil No. 1:26-cv-00279-LEK-RT<br><br>**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF; MEMORANDUM IN SUPPORT OF MOTION; EXHIBIT A; CERTIFICATE OF SERVICE**<br><br>**Judge:** Hon. Leslie E. Kobayashi<br>**Hearing:** October 13, 2026, 2:30pm<br>**Trial Date:** TBD |

**Related Documents:** ECF No. 15 (Plaintiff's Motion for Preliminary Injunction), ECF No. 22 (Defendants' Motion to Dismiss), ECF No. 24 (Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction)

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF**

The American Civil Liberties Union (ACLU) hereby respectfully moves for leave to file its amicus curiae brief in support of Plaintiff. The proposed brief is attached as Exhibit A. Counsel has notified the parties of the ACLU's intention to submit this brief, and the parties consent to the requested relief.

Dated: September 18, 2026.

/s/ *Joseph A. Gomes*

Joseph A. Gomes

Counsel for Amicus Curiae
American Civil Liberties Union

Joseph A. Gomes, Esq., AAL LLC (HI Bar No. 6789)
1170 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii 96837
Telephone: (808) 780-4179
Email: joegomesesq@gmail.com

Brian Hauss*
Ken Sexauer*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: bhauss@aclu.org
Email: ksexauer@aclu.org

Counsel for Amicus Curiae American Civil Liberties Union

* *Pro hac vice* forthcoming

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAI‘I , a Hawai‘i nonprofit corporation,<br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Hawai‘i Attorney General, and NADINE ANDO, in her official capacity as Director of Hawai‘i Department of Commerce and Consumer Affairs,<br>Defendant. | Civil No. 1:26-cv-00279-LEK-RT<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF**<br><br>**Judge:** Hon. Leslie E. Kobayashi<br>**Hearing:** October 13, 2026, 2:30pm<br>**Trial Date:** TBD |

**Related Documents:** ECF No. 15 (Plaintiff’s Motion for Preliminary Injunction), ECF No. 22 (Defendants’ Motion to Dismiss), ECF No. 24 (Defendants’ Memorandum in Opposition to Plaintiff’s Motion for Preliminary Injunction)

**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF**

The American Civil Liberties Union (ACLU) respectfully moves for leave to submit a brief in this matter as amicus curiae. The ACLU is a nationwide, nonprofit organization that works to protect the civil rights and liberties of everyone in the United States. It frequently engages in advocacy concerning civil rights and liberties issues, including litigation aimed at reconciling campaign-finance legislation with First Amendment principles. The ACLU's public advocacy on civil rights and liberties issues would be directly affected by provisions like those contained in Act 11. The proposed amicus brief offers an illustration of that impact, along with analysis of the law's constitutional deficiencies.

The ACLU asks the Court to exercise its broad discretion to allow it to file an amicus brief. *See Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) ("The district court has broad discretion to appoint amici curiae."), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). "District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *NGV Gaming, Ltd. v. Upstream Point Molate*, LLC, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (quoting *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003)). "Even when a party is very well represented, an amicus may

provide important assistance to the court." *Jamul Action Comm. v. Stevens*, No. 2:13–CV–01920–KJM–KJN, 2014 WL 3853148, at *6 (E.D. Cal. Aug. 5, 2014) (quoting *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.)).

Amici may be either impartial individuals or interested parties. *Funbus Sys., Inc. v State of Cal. Pub. Utils. Comm'n*, 801 F.2d 11210, 1125 (9th Cir. 1986). Ultimately, a "court may grant leave to appear as an *amicus* if the information offered is timely and useful." *Long v. Coast Resorts, Inc.*, 49 F. Supp. 2d 1177, 1178 (D. Nev. 1999) (internal citation and quotation marks omitted).

The ACLU is dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. It also participates in public debate about civil rights and liberties. The proposed amicus curiae brief describes how Act 11 directly prohibits and indirectly chills a wide variety of public advocacy engaged in by nonprofit and civil society organizations like the ACLU, and so runs afoul of the First Amendment.

The ACLU appears as a single, institutional amicus curiae; no counsel for any party authored the proposed brief in whole or in part, and no person other than amicus curiae or counsel contributed funds to its preparation or submission.

This motion and the proposed brief are submitted while Plaintiff's Motion for a Preliminary Injunction (ECF No. 15) and Defendants' Motion to Dismiss (ECF

No. 22) are pending. The Court's consideration of the ACLU's brief will not delay the proceedings.

For these reasons, the ACLU asks the Court to grant its Motion for Leave to File an Amicus Brief and authorize the filing of the brief attached as Exhibit A.

Dated: September 18, 2026.

*/s/ Joseph A. Gomes*

Joseph A. Gomes

Counsel for Amicus Curiae
American Civil Liberties Union

Joseph A. Gomes, Esq., AAL LLC (HI Bar No. 6789)
1170 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii 96837
Telephone: (808) 780-4179
Email: joegomesesq@gmail.com

Brian Hauss*
Ken Sexauer*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: bhauss@aclu.org
Email: ksexauer@aclu.org

Counsel for Amicus Curiae American Civil Liberties Union

* *Pro hac vice* applications forthcoming

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAIʻI , a Hawaiʻi nonprofit corporation,<br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Hawaiʻi Attorney General, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br>Defendant. | Civil No. 1:26-cv-00279-LEK-RT<br><br>**AMICUS CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION IN SUPPORT OF PLAINTIFF**<br><br>**Judge:** Hon. Leslie E. Kobayashi<br>**Hearing:** October 13, 2026, 2:30pm<br>**Trial Date:** TBD |

**Related Documents:** ECF No. 15 (Plaintiff's Motion for Preliminary Injunction), ECF No. 22 (Defendants' Motion to Dismiss), ECF No. 24 (Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction)

**EXHIBIT A**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, amicus curiae American Civil Liberties Union certifies that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock.

Dated: September 18, 2026

*/s/ Joseph A. Gomes*

Joseph A. Gomes

Counsel for Amicus Curiae
American Civil Liberties Union

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICUS CURIAE ...................................................................1

INTRODUCTION ..................................................................................3

ARGUMENT ......................................................................................5

I. Act 11 prevents civil society organizations and their members from exercising their constitutional right to participate in the political process ........................................................................5

A. The ACLU and ACLUF regularly engage in "ballot-issue activity" in states throughout the country .......................................8

B. Prohibitions on "election activity" will chill the ACLU's speech about candidates' positions on civil liberties issues...........11

II. Act 11 cannot evade the First Amendment by restyling its restriction on corporate speech as a limitation of corporate power .........15

CONCLUSION ....................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. Jennings*,
366 F. Supp. 1041 (D.D.C. 1973) .................................................... 14, 15

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021)........................................................................7

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986).......................................................................17

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).........................................................................18

*Buckley v. Valeo*,
424 U.S. 1 (1976)...................................................................2, 11, 15

*Chiles v. Salazar*,
607 U.S. 627 (2026).......................................................................18

*Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*,
454 U.S. 290 (1981)........................................................................7

*Citizens United v. FEC*,
558 U.S. 310 (2010)............................................................. 2, 4, 15, 16

*FCC v. League of Women Voters*,
468 U.S. 364 (1984).......................................................................17

*FEC v. Mass. Citizens for Life, Inc.*,
479 U.S. 238 (1986).......................................................................15

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026)........................................................................7

*First National Bank of Boston v. Belotti*,
435 U.S. 765 (1978)....4, 15

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952)....18

*McConnell v. FEC*,
540 U.S. 93 (2003)....2

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971)....17

*NAACP v. Alabama ex rel. Flowers*,
377 U.S. 288 (1964)....18

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....7, 8

*NAACP v. Button*,
371 U.S. 415 (1963).... 16, 17, 18

*NAACP v. Claiborne Hardware*,
458 U.S. 886 (1982)....7, 17

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....17

*Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)....17

*Randall v. Sorrell*,
548 U.S. 230 (2006)....2

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....7

*Staats* v. *ACLU*,
422 U.S. 1030 (1975) .......... 14

*TikTok, Inc. v. Garland*,
604 U.S. 56 (2025) .......... 17

**Statutes**

Act 11, Session Laws of Hawaii 2026 .......... *passim*

**Other Authorities**

*ACLU Mother's Day Family Reunification Ad*, N.Y. Times, May 9, 2021, at 8–9, *available at* https://perma.cc/L2RT-7XVU .......... 14

ACLU, *Congressional Scorecards*, https://perma.cc/4VXL-E2PR .......... 12

ACLU, *Protecting Rights Up and Down the Ballot*, https://perma.cc/C8N7-S9M9 .......... 10, 13

*Dear President-elect Trump*, N.Y. Times, Nov. 11, 2016, at A9, *available at* https://perma.cc/429J-PM4W .......... 13

*Mr. President, the America We Believe in Is Not Your America*, N.Y. Times, Jan. 31, 2006, at A9, *available at* https://perma.cc/568L-4SS3 .......... 13

*What Will It Be Mr. President?*, N.Y. Times, Mar. 7, 2010, at 8, *available at* https://perma.cc/2UDL-BZ6W .......... 13

## INTEREST OF AMICUS CURIAE[1]

The American Civil Liberties Union, Inc. (ACLU) is a nationwide, nonprofit organization with more than 1.7 million members. Since 1920, the ACLU has sought to protect the civil liberties and rights of everyone in the United States. It frequently engages in advocacy concerning civil rights and liberties issues. Both the ACLU and the American Civil Liberties Union Foundation, Inc. (ACLUF)—Internal Revenue Code Section 501(c)(4) and 501(c)(3) nonprofit organizations, respectively—support or oppose ballot questions pertaining to civil liberties and rights. And although the ACLU is a resolutely nonpartisan organization, it seeks to educate the public about the policy positions of candidates for elected office on issues affecting civil rights and liberties, as well as pushing for official action on those issues. The kinds of restrictions contained in Act 11 would significantly impede the ACLU and ACLUF's advocacy in support of their mission.

The ACLU frequently appears as amicus curiae, and the ACLUF frequently appears as counsel, in courts throughout the country in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. For the last 50 years, the ACLU and ACLUF have been deeply engaged in the effort to reconcile campaign finance

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

legislation with First Amendment principles, participating in the following cases as counsel, party, or amicus curiae: *Buckley v. Valeo*, 424 U.S. 1 (1976) (counsel), *McConnell v. FEC*, 540 U.S. 93 (2003) (counsel, party), *Randall v. Sorrell*, 548 U.S. 230 (2006) (counsel), *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) (amicus), and *Citizens United v. FEC*, 558 U.S. 310 (2010) (amicus). This brief does not purport to express the views of the ACLU's affiliates or any other organization. The ACLU of Hawaiʻi does not join this brief.

## INTRODUCTION

The amount of money now being spent on political campaigns has created a growing skepticism about the integrity of our democratic process. The State of Hawai‘i is right to treat those concerns seriously. But its measures to address them must be consistent with our constitutional commitment to freedom of speech and association. The statute at issue here—which bans "artificial persons" from spending money to engage in any speech that "directly or indirectly" supports or opposes a candidate or ballot issue—is far wide of the mark. Its sweeping restriction would prevent all manner of organizations from engaging in core political speech on matters of immense public concern.

Act 11, Session Laws of Hawai‘i 2026 ("Act 11" or "the Act") purports to limit the "powers" of a wide variety of associations, including business corporations, nonprofit corporations, professional corporations, limited partnerships, limited liability companies, and even unincorporated nonprofit associations. *See* Haw. Act 11 §§ 4–6, 8–10, 17–22. The Act amends the laws governing these entities to afford only "artificial-person powers," which the Act defines as "the same powers as an individual to do all things necessary or convenient to carry out the corporation's lawful business and affairs, excluding any power to directly *or indirectly* engage in election activity or ballot-issue activity." *Id.* § 4 (emphasis added); *see also id.* §§ 8, 17, 19, 22. It defines "ballot-issue activity" and "election activity" as "paying,

contributing, or expending money or anything of value to support or oppose" either a ballot question or a candidate, political committee, or political party, respectively. *Id.* § 4; *see also id.* §§ 8, 17, 19, 22. The Act deems these activities *ultra vires* and void when performed by regulated entities. *Id.* §§ 6, 10, 18, 20, 21. And it empowers the Attorney General and the Director of Commerce and Consumer Affairs to impose a number of penalties for *ultra vires* acts, including revocation of state tax-exempt status, temporary or permanent suspension of the entity's authority to operate in the state, and dissolution. *Id.* § 24.[2]

The Act directly prohibits and indirectly chills a great deal of political advocacy engaged in every day by nonprofit and charitable organizations across the ideological spectrum. Its goal of suppressing such speech by "artificial persons" is plainly inconsistent with the Supreme Court's decisions in *First National Bank of Boston v. Belotti*, 435 U.S. 765 (1978), and *Citizens United v. FEC*, 558 U.S. 310 (2010). In its attempt to end-run these precedents, the State argues that a corporation does not have any First Amendment "right" to speak unless the government has first granted it the "power" to exercise that right through its corporate charter. Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. 7–8, ECF No. 24 ("Defs.' PI Br."). If

---

[2] The Act stipulates that ballot-issue activity and election activity "do[] not include any bona fide news story, commentary, or editorial distributed through the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication." *Id.* § 4; *see also id.* §§ 8, 17, 19, 22.

the State's theory were correct, then the government could always avoid First Amendment scrutiny simply by recasting its speech restrictions as limitations on corporations' power to speak—meaning that "artificial persons," including nonprofit and charitable corporations like the ACLU and ACLUF, would possess First Amendment rights only with the government's permission. The State's argument threatens to negate First Amendment protection for all kinds of civil society organizations, impinging on the right to associate itself. This Court should hold that Act 11 violates the First Amendment.

## ARGUMENT

### I. Act 11 prevents civil society organizations and their members from exercising their constitutional right to participate in the political process.

There are thousands of nonprofit, issue-focused groups operating in the United States. Some work to protect the environment or civil rights. Others champion specific tax and social policies. Still more advocate for various positions on public safety, education, healthcare, and national security. In our democracy, if there is an issue people care about, you can usually find a group that works to persuade voters and lawmakers to adopt their position on that issue. They do so by broadcasting their views to members and the public at large about legislation, ballot initiatives, and candidate positions on the issues germane to their respective missions. Many of these groups spend money to disseminate their message—

including through posters, pamphlets, and rallies, as well as paid advertisements in newspapers and magazines, on broadcast televisions and radio, or on the internet and social media. Additionally, many charitable organizations engage in advocacy related to ballot initiatives, as permitted under the federal tax code. Act 11's restriction on political speech by "artificial persons," simply because they hold corporate charters, impoverishes public discourse by preventing these civil society organizations from promoting their views on the issues of the day.

Much of the ACLU's advocacy in defense of civil rights and liberties around the country would be banned or chilled under restrictions like those in Act 11. First, the Act's prohibition on ballot-issue advocacy by nonprofit corporations would apply to the ACLU's and ACLUF's spending on ballot measures related to abortion access, LGBTQ rights, judicial independence, and voting rights. Second, the Act's prohibition on speech that "indirectly" supports or opposes a candidate would inevitably chill the ACLU's public advocacy about candidates and officials. Although the ACLU is strictly nonpartisan, it often spends money on communications and publications seeking to educate voters about candidates' positions on civil liberties issues or to advocate for official action on those issues. Act 11 threatens to suppress or chill this advocacy because it prohibits communications that could be construed as "indirect" support for or opposition to a

candidate or party. And it is likely to have a similar effect on other nonprofits across the ideological spectrum.

The Supreme Court has repeatedly reaffirmed that "[t]he First Amendment . . . rights to speak, worship, publish, assemble, and petition their government freely" carry with them "a corresponding right to associate with others" in order to do so. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026) (internal quotation marks omitted) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021)); *see also, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process" because it enables individuals "to make their views known" through "collective effort . . . when, individually, their voices would be faint or lost." *NAACP v. Claiborne Hardware*, 458 U.S. 886, 907–08 (1982) (quoting *Citizens Against Rent Control Coal. for Fair Hous. v. Berkeley*, 454 U.S. 290, 294 (1981)). "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Id.* at 908 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958)).

The ACLU is a 501(c)(4) nonprofit corporation and membership organization dedicated to preserving, protecting, and advancing civil rights and liberties in the United States. It serves as "the medium through which [its 1.7 million] members

seek to make more effective the expression of their own views" on civil rights and liberties. *Patterson*, 357 U.S. at 459. Like other advocacy groups, the ACLU conveys its message through multiple media, including the organization's webpage, social media accounts, email, direct mail campaigns, membership drives, press releases, news conferences, public appearances, and pamphlets. In addition to its own communications platforms and earned media, the ACLU relies on paid media to ensure that messages reach its targeted audiences.

The ACLU actively participates in public debates about civil rights and civil liberties issues. It regularly communicates with the public about candidates' positions, the actions of government officials standing for election, and ballot measures before the voters. The ACLUF, a 501(c)(3) public charity, also engages with ballot initiatives by frequently contributing to ballot measure committees and through public-facing communications. Ill-defined restrictions on "ballot-issue activity" and "election activity" by nonprofit corporations would stifle a great deal of this protected expression.

### *A. The ACLU and ACLUF regularly engage in "ballot-issue activity" in states throughout the country.*

Act 11 prohibits nonprofit entities like the ACLU and ACLUF from engaging in "ballot-issue activity," which it defines as "paying, contributing, or expending money or anything of value to support or oppose a constitutional amendment, county charter amendment, or other ballot question after it has been formally certified or

submitted to the electors of the State or any county." Haw. Act 11 §§ 8–11. If put into effect, the law would prohibit the ACLU, ACLUF, and other charitable or nonprofit organizations from contributing to ballot committees or taking out their own advertisements in support of, or opposition to, ballot measures. It would also prevent such organizations from spending resources to organize or facilitate rallies and canvassing operations in which members take to the streets to educate other citizens and make their voices heard. It could even be read to prohibit an organization's use of staff time to research ballot measures, formulate the organization's position, and disseminate its views. Such restrictions impede the ACLU and ACLUF from advancing their mission to protect civil rights and liberties.

Civil liberties questions are often addressed through ballot measures. The ACLU and ACLUF frequently expend resources—including through organizing, coalition building, and financial contributions to ballot committees—to alert the public about important civil liberties issues on the ballot and to persuade them to vote in a manner that protects or advances our freedoms under the law. This election cycle alone, the ACLU and ACLUF are participating in multiple ballot measure campaigns regarding threats to the independence of the judiciary and democratic

process, reproductive freedom, and LGBT rights.[3] These campaigns are taking place all over the country, including in:

- **Kansas,** where the ACLU and ACLUF helped the local ballot committee defeat a ballot proposition that would have replaced the nonpartisan judicial selection process for Kansas Supreme Court Justices with partisan elections;
- **Missouri,** where the ACLU and ACLUF worked with the ballot committee to persuade voters to strike down an attempt to upend the process for citizens to initiate ballot measures by requiring majorities in every congressional district rather than by statewide vote; and where the ACLU and ACLUF are supporting another ballot committee opposing a measure that would repeal a citizen-initiated reproductive freedom amendment, re-ban abortion, and place a ban on gender-affirming care for minors in the state constitution;
- **Montana,** where the ACLU and ACLUF are supporting a ballot committee advocating for a measure that would enshrine nonpartisan judicial elections in the state constitution to ensure that an independent judiciary presides over cases involving civil rights and liberties in the state; and
- **Virginia,** where the ACLU and ACLUF are supporting ballot committees urging voters to amend the state constitution to protect reproductive freedom, including abortion, contraception, fertility care, and miscarriage management for women in the state, and to repeal the state constitution's provision stating that marriage is between one man and woman.

The ACLU's advocacy on these ballot measures would be banned under Act 11 because it involves "paying, contributing, or expending money . . . to support or oppose a . . . ballot question." Haw. Act 11 §§ 8–11.

---

[3] ACLU, *Protecting Rights Up and Down the Ballot*, https://perma.cc/C8N7-S9M9.

*B. Prohibitions on "election activity" will chill the ACLU's speech about candidates' positions on civil liberties issues.*

Act 11 further prohibits nonprofit organizations like the ACLU from engaging in "election activity," even when done "indirectly." *Id.* §§ 8–11. The Act defines election activity as "paying, contributing, or expending money or anything of value to support or oppose a candidate, political committee, or political party." *Id.* § 8. Notably, the Act does not define what kinds of communications would constitute "indirect" support or opposition. It presumably is not limited to language "that in express terms advocate . . . election or defeat" of a given candidate, using words such as "vote for" or "reject." *Buckley*, 424 U.S. at 44 & n.52. But the statutory language provides no clue as to what else might be encompassed.

While the ACLU is firmly nonpartisan, it often devotes money, staff time, and other organizational resources to inform voters about candidates' positions on key civil rights and liberties issues, or to advocate for incumbent officials to take some specific action on those issues; these communications frequently refer to candidates by name. A ban on the expenditure of organizational resources to "indirectly" support or oppose a candidate could easily be construed to prohibit the ACLU from engaging in these core forms of public advocacy.

Take, for example, the ACLU's congressional scorecard system.[4] To inform the public about their legislators' track records on civil rights and civil liberties issues—including criminal law reform, disability rights, free speech, racial justice, and others—the ACLU tracks members' votes on legislation affecting those issues.[5] The ACLU assigns a percentage score to each member of Congress, including all four members of Hawaiʻi's congressional delegation, based on the share of their votes for or against legislation that affects civil rights and liberties, and publishes the resulting scorecard.[6] The ACLU does this so that constituents who share its commitment to liberty and equality can understand how their representatives are voting. Under Act 11, state officials could punish the ACLU for publishing this type of information if they determine that communications about these scores constitute indirect support for, or opposition to, individual candidates.

The ACLU also works to inform voters about the positions of candidates for state office. In this election cycle, for instance, the ACLU is expending significant resources across three states to educate voters about the civil-liberties positions of candidates for state Supreme Court, secretaries of state, and state legislators.[7] These public education campaigns include the state Supreme Court race in North Carolina;

---

4 *See* ACLU, *Congressional Scorecards*, https://perma.cc/4VXL-E2PR.
5 *Id.*
6 *Id.*
7 ACLU, *supra* note 3.

Secretary of State race in Arizona; and state legislative races in North Carolina and Michigan.[8] These efforts all involve expending financial and operational resources. All would be jeopardized under restrictions like those in Act 11 if public officials were to conclude that these voter education campaigns "indirectly" support or oppose the candidates discussed.

For many years, the ACLU has used paid advertisements as a tool to hold elected officials accountable for their positions on Americans' civil rights and liberties. It has taken out full page advertisements in *The New York Times* concerning the policies of every President elected in the twenty-first century. The ACLU's advertisements during the Obama and Bush administrations criticized the government's infringement of civil liberties in the name of national security.[9] After the 2016 election, the ACLU took out a full-page ad in *The New York Times* asking then-President-elect Trump to reconsider his campaign promises to undertake a mass deportation of undocumented immigrants, ban Muslims from the United States, restrict abortion rights, authorize torture, and undermine freedom of expression.[10] And during the Biden Administration, the ACLU bought a two-page ad in the

---

[8] *Id.*

[9] *See Mr. President, the America We Believe in Is Not Your America*, N.Y. Times, Jan. 31, 2006, at A9, *available at* https://perma.cc/568L-4SS3; *What Will It Be Mr. President?*, N.Y. Times, Mar. 7, 2010, at 8, *available at* https://perma.cc/2UDL-BZ6W.

[10] *Dear President-elect Trump*, N.Y. Times, Nov. 11, 2016, at A9, *available at* https://perma.cc/429J-PM4W.

Mother's Day 2021 edition of *The New York Times* urging the President to reunite families of immigrant children separated from their parents as a part of the previous administration's family separation policy.[11]

And the ACLU's advocacy has been suppressed by unconstitutional restrictions like those contained in Act 11. For example, in the runup to the 1972 election, the ACLU sought to sponsor a paid advertisement in *The New York Times* criticizing the Nixon Administration's anti-busing policies and praising members of Congress who had disagreed with the President's position on busing. *See ACLU v. Jennings*, 366 F. Supp. 1041, 1042–43 (D.D.C. 1973), *vacated as moot sub nom. Staats* v. *ACLU*, 422 U.S. 1030 (1975). The advertisement would have listed an "honor roll" consisting of the names of every member of Congress who opposed President Nixon's anti-busing policy. *Id.* at 1043. But, on advice of counsel, the newspaper refused to print the ad for fear of criminal penalties under a provision of the Federal Election Campaign Act and its implementing regulations that regulated the placement of ads "on behalf of" or "in derogation of" a candidate. *Id.* The ACLU challenged the law under the First Amendment and won. The court held that the challenged provision "establishe[d] impermissible prior restraints, discourage[d] free and open discussion of matters of public concern and as such must be declared

---

[11] *ACLU Mother's Day Family Reunification Ad*, N.Y. Times, May 9, 2021, at 8–9, *available at* https://perma.cc/L2RT-7XVU.

an unconstitutional means of effectuating legislative goals." *Id.* at 1050–51. Act 11 similarly constrains the ACLU's ability to publicly hold elected officials to account, and it should meet a similar end.

## II. Act 11 cannot evade the First Amendment by restyling its restriction on corporate speech as a limitation of corporate power.

The First Amendment, as interpreted by the Supreme Court, forbids Act 11's restriction on any expenditure of "money or anything of value" by an "artificial person" to engage in speech that "directly or indirectly" supports or opposes a candidate or ballot question. First, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Court held that the First Amendment bars the government from restricting independent expenditures in support of or opposition to a candidate. *Id.* at 19. Second, in *Belotti*, the Court struck down a restriction against corporate expenditures on ballot initiatives, reasoning that the law violated the First Amendment right of corporations to express their political views. 435 U.S. at 767. Third, in *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986), the Supreme Court held that the First Amendment bars restrictions on independent expenditures in candidate races by nonprofits that do not accept contributions from business corporations. Finally, in *Citizens United*, the Court held that the First Amendment protects the right of all corporations to make independent expenditures in candidate races. 558 U.S. at 365. Act 11 thus goes much further than repudiating *Citizens United*—by broadly restricting *all* corporations

(including nonprofits like the ACLU and ACLUF) from spending money on political speech, it contravenes a half century of Supreme Court precedent.

At bottom, Act 11 challenges the well-established principle "that First Amendment protection extends to corporations." *Citizens United*, 558 U.S. at 342 (collecting cases); *see also, e.g.*, *NAACP v. Button*, 371 U.S. 415, 428 (1963) (holding that the NAACP "may assert this [First Amendment] right on its own behalf, because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail"). The State tries to sidestep this blackletter law by framing Act 11's restrictions on political speech as a limitation on corporations' *power* to speak, rather than an infringement of their *right* to speak, thus obviating the need to justify the Act's restriction on political speech under strict (or even intermediate) First Amendment scrutiny.

According to the State, *every* restriction on corporate political speech struck down by the Supreme Court can be resurrected by restyling it as a limitation on corporate power. The State could even selectively restrict corporations' power to advocate for disfavored *views* on hot-button topics from abortion to gun control to LGBT rights. Such laws would be viewpoint discriminatory, just as Act 11 is content discriminatory against political speech, but the State's theory would recast them as

"valid exercise[s] of the State's longstanding authority to define corporate powers" that do not implicate the First Amendment at all. Defs.' PI Br. 8.[12]

Indeed, the State's theory implies that neither nonprofit nor for-profit corporations truly possess *any* First Amendment rights, because the government could simply deny them the antecedent power to exercise those rights. After all, if the government can deprive corporations of the "power" to spend money on ballot-issue and candidate advocacy, notwithstanding Supreme Court precedent holding that such speech may not be restricted, why could it not deprive a corporation of the power to speak at all about public controversies? *See FCC v. League of Women Voters*, 468 U.S. 364 (1984). And why could it not equally deny corporations the power to lobby government officials, *see Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), or criticize them, *see New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)? What would prevent the government from denying corporations the power to organize a demonstration, *see Claiborne Hardware*, 458 U.S. at 930–32, solicit clients, *Button*, 371 U.S. at 428, or publish government secrets, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)? For that matter, why couldn't the government condition corporations' power to distribute films, books, or

---

[12] *But cf. TikTok, Inc. v. Garland*, 604 U.S. 56, 68–70 (2025) (applying heightened First Amendment scrutiny to a federal statute that regulated corporate control—without directly restricting speech at all—because the law had the effect of disproportionately burdening speech (citing *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–704 (1986))).

other media on certification by government officials that the material is fit for public consumption? *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). The State's theory would open a Pandora's box of government restrictions on speech by "artificial persons"—i.e., civil society writ large. The State offers no limiting principle that would forestall the slide down this slippery slope.

The Court should reject the State's semantic maneuver. "The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'" *Chiles v. Salazar*, 607 U.S. 627, 645 (2026) (rejecting Colorado's characterization of talk-therapy as a form of conduct) (quoting *Button*, 371 U.S. at 429). Instead, the Court must "look through forms to the substance" and determine whether Act 11 unconstitutionally restricts protected speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (striking down a Rhode Island statute, even though it did not directly restrict speech, because it effectuated an informal system of censorship through threats of legal action). The State's characterization of Act 11 cannot obscure the obvious reality that the statute—especially as applied to nonprofit, nonpartisan corporations like the ACLU—concerns "not the privilege of a corporation to do business in a State, but rather the freedom of individuals to associate for the collective advocacy of ideas" in the political arena. *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 309 (1964).

The government can no more limit a corporation's "power" to engage in protected expression on matters of public concern than it can punish the speech itself.

## CONCLUSION

Act 11 threatens to hamper core forms of public advocacy deployed by countless nonprofits groups like the ACLU and the ACLUF. And it is premised on an untenable theory of plenary government power over the speech rights of civil society organizations. For the foregoing reasons, the Court should hold that Act 11 violates the First Amendment.

Dated: September 18, 2026.

/s/ Joseph A. Gomes

Joseph A. Gomes, Esq., AAL LLC
HI Bar No. 6789
1170 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii 96837
Telephone: (808) 780-4179
Email: joegomesesq@gmail.com

Brian Hauss*
Ken Sexauer*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Email: bhauss@aclu.org
Email: ksexauer@aclu.org

Counsel for Amicus Curiae
American Civil Liberties Union

* *Pro hac vice* applications forthcoming

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.4(e), I certify that the foregoing brief is in 14-point Times New Roman, double-spaced, and contains 4205 words, exclusive of the case caption, tables of contents and authorities, and certificates, as counted by Microsoft Word, in compliance with LR7.4(b) and (d).

Dated: September 18, 2026.

/s/ Joseph A. Gomes

Joseph A. Gomes

Counsel for Amicus Curiae
American Civil Liberties Union

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record through the Court's CM/ECF system.

Dated: September 18, 2026.

/s/ Joseph A. Gomes

Joseph A. Gomes

Counsel for Amicus Curiae
American Civil Liberties Union