MATEO CABALLERO (HI Bar No. 10081)
CABALLERO LAW LLLC
P.O. Box 235052
Honolulu, Hawaiʻi, 96823
Telephone: (808) 600-4749
mateo@caballero.law
*Attorney for* Amici Curiae

*Additional counsel listed on next page*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF HAWAIʻI**

| | |
|---|---|
| GRASSROOT INSTITUTE OF HAWAII, a Hawaiʻi nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as Hawaiʻi Attorney General, and NADINE ANDO, in her official capacity as Director of Hawaiʻi Department of Commerce and Consumer Affairs,<br><br>Defendants. | No. 1:26-cv-00279-LEK-RT<br><br>BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing Date: October 13, 2026<br>Hearing Time: 2:30 p.m.<br>Judge: Hon. Leslie E. Kobayashi<br>Related Docket Numbers: 15 & 22 |

ERIN CHLOPAK*
KEVIN P. HANCOCK*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
echlopak@campaignlegal.org
khancock@campaignlegal.org

STUART MCPHAIL*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20004
Telephone: (202) 408-5565
smcphail@citizensforethics.org

*Attorneys for* Amici Curiae

**Admitted* pro hac vice

## CORPORATE DISCLOSURE STATEMENT

Campaign Legal Center and Citizens for Responsibility and Ethics in Washington are non-profit organizations organized under Section 501(c)(3) of the Internal Revenue Code. Neither Campaign Legal Center nor Citizens for Responsibility and Ethics in Washington have a parent corporation or issues stock. There are no publicly held corporations that own 10 percent or more of the stock of either organization.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTEREST OF AMICI CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 3

I. The Safeguards *Citizens United* Assumed Would Check Corporate Election Spending Have Failed, and Act 11 is a Rational Response to that Failure .......... 3

A. *Citizens United* assumed that independence, disclosure, and corporate democracy would check the dangers of corporate election spending .......... 3

B. The "safeguards" that were supposed to minimize harms from corporate election spending have failed in the 16 years since *Citizens United* .......... 3

1. Super PACs and coordination .......... 7

2. Dark Money .......... 9

3. Direct corporate treasury spending .......... 12

II. Act 11 Is Not Unconstitutionally Vague .......... 15

A. Act 11's "support or oppose" standard is not unconstitutionally vague .......... 16

B. "Bona fide news" and similar terms are not unconstitutionally vague .......... 19

CONCLUSION .......... 23

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Alaska Right to Life Committee v. Miles*, 441 F.3d 773 (9th Cir. 2006) .................. 18

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) .................. 5

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) .................. 5, 13

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) .................. 9

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .................. 14

*California Teachers Association v. State Board of Education*, 271 F.3d 1141 (9th Cir. 2001) .................. 15

*Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) .................. 17

*Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013) .................. 17, 21

*Citizens for Responsible Government State Political Action Committee v. Davidson*, 236 F.3d 1174 (10th Cir. 2000) .................. 23

*Citizens United v. FEC*, 558 U.S. 310 (2010) .................. 1, 2, 3, 4, 5, 6, 7, 9, 21

*Colorado Right to Life Committee, Inc. v. Coffman*, 498 F.3d 1137 (10th Cir. 2007) .................. 15

*CTS Corporation v. Dynamics Corporation of America*, 481 U.S. 69 (1987) .................. 14

*FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) .................. 13, 20

*FEC v. Phillips Publishing, Inc.*, 517 F. Supp. 1308 (D.D.C. 1981) .................. 21, 22

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) .................. 21, 22

*Freedom Path, Inc. v. IRS*, 805 F. Supp. 3d 329 (D.D.C. 2025) .................. 9

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........ 15

*Griffin v. Lockhart*, 935 F.2d 926 (8th Cir 1991) ........ 19

*McConnell v. FEC*, 540 U.S. 93 (2003) ........ 3, 16, 18

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ........ 1

*National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) .... 17, 18

*National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404 (June 30, 2026) ........ 1

*New York State Club Association v. City of New York*, 487 U.S. 1 (1988) ........ 16

*Reader's Digest Association v. FEC*, 509 F. Supp. 1210 (S.D.N.Y. 1981) ........ 21, 22

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) ........ 7

*United States v. Householder*, 137 F.4th 454 (6th Cir. 2025) ........ 11

*United States v. Williams*, 553 U.S. 285 (2008) ........ 15, 19

*Vermont Right to Life Committee, Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) ....... 17

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........ 15

*Ward v. Utah*, 398 F.3d 1239 (10th Cir. 2005) ........ 19

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ........ 1, 15, 17, 18, 19, 23

**Statutes**

26 U.S.C. § 6104(d)(3)(A) ........ 10

42 U.S.C. § 2000e-2(e) ........ 20

52 U.S.C. § 30101(9)(B)(i) ........ 20

52 U.S.C. § 30104(b), (c), (f) ........ 11

52 U.S.C. § 30118 ........ 4

52 U.S.C. § 30118(b)(2), (4)(A) ....................13

52 U.S.C. § 30121(a)(1)....................18

Haw. Rev. Stat. § 11-302 (2025)....................17, 21

Haw. Rev. Stat. § 11-321 (2025)....................11

Haw. Rev. Stat. § 11-355(a)(1)....................18

Haw. Rev. Stat. § 11-335(b) (2025)....................11

Haw. Rev. Stat. § 11-341 (2025)....................11

Haw. Rev. Stat. § 414-3....................3

Or. Rev. Stat. § 260.007(1)....................21

Vt. Stat. tit. 17, § 2902(1)....................21

**Rules**

11 C.F.R. § 100.73(a)....................20

11 C.F.R. § 100.132(a)....................20

26 C.F.R. § 1.501(c)(4)-1(a)(2)....................9

**Other Authorities**

Act 11, § 1....................7

Act 11, § 4....................16, 17, 19, 20

Act 11, § 8....................16, 17, 20

Act 11, § 27....................15

Amended Complaint, *Citizens United v. FEC*, No. 07-cv-2240
(D.D.C. Dec. 21, 2007), ECF No. 22....................6

Anna Massoglia, *Dark Money Hit a Record High of $1.9 Billion in 2024 Federal Races*, Brennan Center for Justice (May 7, 2025), https://perma.cc/22DL-CRSJ ........................................................................10

*Bona Fide*, Black's Law Dictionary (12th ed. 2024) ...........................................19

Campaign Legal Center, *The Illusion of Independence: How Unregulated Coordination Is Undermining our Democracy, and What Can Be Done to Stop It* 1 (2023), https://perma.cc/BBY5-TYGM ........................................................8

Conciliation Agreement, MUR 7690, *PacMar Techs., LLC* (FEC Feb. 13, 2025), https://perma.cc/GH2Y-HEH4 ........................................................................12

Daniel I. Weiner, *Citizens United, Explained*, Brennan Center for Justice (updated Jan. 29, 2025), https://perma.cc/8MCU-4T35 ....................................10

Federal Election Campaign Amendments of 1974, Pub. L. No. 93-443, 88 Stat. 1263 (1974).........................................................................................20

*How Does the Citizens United Decisions Still Affect Us in 2026?*, Campaign Legal Center (Jan. 21, 2026), https://perma.cc/8C2Z-NC8E ......................................10

Luke Fountain, *Trump says he will spend up to $500 million of 'my money' to help Republicans in midterms*, CNBC (Sep. 4, 2026), https://www.cnbc.com/2026/09/04/trump-maga-inc-500-million-republicans-midterm-elections.html (last visited Sep. 21, 2026). ............................................8

Montana Secretary of State, *Proposed 2026 Ballot Issues*, https://perma.cc/4EY7-M4BJ (last visited Sep. 15, 2026)...........................................................14

Paul Blumenthal, *Anthony Kennedy's Citizens United Disclosure Salve 'Not Working'*, HuffPost (Nov. 2, 2015), https://www.huffpost.com/entry/citizens-united-anthony-kennedy _n_5637c481e4b0631799134b92..............................10

Press Release, FEC Statement on *Carey v. FEC*, Reporting Guidance for Political Committees that Maintain a Non-Contribution Account (Oct. 5, 2011), https://perma.cc/B5LU-DSBQ........................................................................13

Rick Claypool, *Corporate Supremacist Super PACs Drive $500 Million Midterm Spending Surge*, Public Citizen (June 30, 2026), https://perma.cc/8A7D-WEMJ ..................................................................13, 14

Shanna Ports, *Major Victory: CLC Complaint Delivers Rare Accountability for Maine Voters*, Campaign Legal Center (May 5, 2025), https://perma.cc/R7VX-N9B5 ....... 12

*Super PACs*, OpenSecrets, https://www.opensecrets.org/political-action-committees-pacs/super-pacs/2024 (last visited Sep. 21, 2026) ....... 7

Stipulation and Consent Judgment, *Carey v. FEC*, No. 11-cv-259 (D.D.C. Aug. 19, 2011), ECF No. 26 ....... 13

Trevor Potter, *A Dereliction of Duty: How the FEC Commissioners' Deadlocks Result in a Failed Agency and What Can Be Done*, 27 Geo. Mason L. Rev. 483 (2020) ....... 10

Trevor Potter, *The Failed Promise of Unlimited "Independent" Spending in Elections*, 45 Hum. Rts. 22 (2020) ....... 8

Trevor Potter & Bryson B. Morgan, *The History of Undisclosed Spending in U.S. Elections & How 2012 Became the "Dark Money" Election*, 27 Notre Dame J.L. Ethics & Pub. Pol'y 383 (2013) ....... 9

# BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## INTEREST OF *AMICI CURIAE*

*Amici curiae* Campaign Legal Center ("CLC") and Citizens for Responsibility and Ethics in Washington ("CREW") are nonprofit, nonpartisan organizations working for a more transparent, ethical, and accountable democracy at all levels of government. CLC and CREW have participated as counsel or *amicus* in numerous U.S. Supreme Court cases addressing the regulation of money in politics, including *Citizens United v. FEC*, 558 U.S. 310 (2010), *McCutcheon v. FEC*, 572 U.S. 185 (2014), *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404 (June 30, 2026), and in the Ninth Circuit in *Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015). For more than 15 years, CLC and CREW have also documented how the campaign finance system has actually functioned since *Citizens United*. That record bears directly on the reasonableness of Hawai‘i's Act 11, and on Plaintiff's incorrect claim that the Act's terms are too indefinite to be applied.[1]

[1] No party's counsel authored this brief in whole or in part, and no person other than *amici* or its counsel contributed money intended to fund its preparation or submission. *Amici* are filing a motion for leave to file this brief concurrently herewith. Plaintiff does not oppose, and Defendants consent to that motion.

## SUMMARY OF ARGUMENT

Plaintiff's case rests on the premise that Act 11 is *Citizens United* all over again: a State attempting to suppress corporate political speech out of hostility to corporate wealth. It is not. Defendants and *amicus* Center for American Progress explain in detail why Act 11 is a corporate-law measure subject to rational basis review rather than a restriction on speech, like the campaign-finance provision that *Citizens United* subjected to the First Amendment scrutiny. *See* Defs.' Opp'n to Mot. for Prelim. Inj. at 7-13, ECF No. 24; CAP *Amicus* Br., ECF No. 23-2. *Amici* write to make two separate points that fall within their particular expertise.

First, Act 11 was enacted against a well-documented record that the safeguards *Citizens United* claimed would check the harms of corporate election spending have failed. The Court did not hold that such spending was harmless. It held that the harms would be controlled by other mechanisms—the genuine independence of outside spending from candidates, "effective disclosure" of that spending to the public, and the ability of shareholders and members to police abuses "through the procedures of corporate democracy." 558 U.S. at 360, 362, 370. Sixteen years later, the evidence is overwhelming that none of those safeguards has worked. Super PACs coordinate openly with the candidates they support, and the Federal Election Commission ("FEC") has never voluntarily found a coordination violation. Dark money in federal elections—including in Hawaiʻi—has grown from less than

$5 million in 2006 to $1.9 *billion* in 2024. And direct spending from corporate treasuries has reached record levels. Hawai‘i's decision to define the artificial persons it charters as lacking the power to spend in elections is a rational response to that record, adopted through a channel—the states' plenary authority to define corporate powers—that *Citizens United* left untouched.

Second, Act 11 is not unconstitutionally vague. Its "support or oppose" formulation mirrors language upheld against vagueness challenges by the Supreme Court in *McConnell v. FEC*, 540 U.S. 93 (2003), by the Ninth Circuit in *Yamada*, and by four other courts of appeals. Its exemption for "bona fide news story, commentary, or editorial" tracks the federal press exemption that has been force, and applied by the FEC and the courts, since 1974. Haw. Rev. Stat. § 414-3. Plaintiff's identification of hypothetical edge cases falls far short of what is required to invalidate a statute on its face.

## ARGUMENT

### I. The Safeguards *Citizens United* Assumed Would Check Corporate Election Spending Have Failed, and Act 11 is a Rational Response to that Failure

#### A. *Citizens United* assumed that independence, disclosure, and corporate democracy would check the dangers of corporate election spending

Citizens United was a nonprofit corporation that produced a documentary critical of then-Senator Hillary Clinton and sought to distribute it through cable video-on-demand within 30 days of the 2008 presidential primaries. *Citizens United*,

558 U.S. at 319-21. Federal law, 52 U.S.C. § 30118, prohibited corporations from using general treasury funds for independent expenditures or electioneering communications. *Citizens United*, 558 U.S. at 320-21.

By a 5-4 vote, the Court invalidated the prohibition on corporate expenditures in Section 30118. It held that political speech does not lose First Amendment protection "simply because its source is a corporation," *Citizens United*, 558 U.S. at 342 (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978)), and that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption," *id.* at 357.

The Court did not hold, however, that corporate election spending posed no danger to the electoral process. Instead, it held that whatever harms might arise would be checked by mechanisms other than a ban on speech. Three such mechanisms were central to its reasoning.

First, the Court stressed the *independence* of corporate independent expenditures. The Court reasoned that, "[b]y definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate," *id.* at 360, and that "[t]he absence of prearrangement and coordination" with a candidate "alleviates the dangers that expenditures will be given as a quid pro quo for improper commitments from the candidate," *id.* at 357 (quoting *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam)). The Court thus predicted a real separation

between candidates and the outside groups spending on their behalf, a prediction it restated as settled the following term. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011).

Second, the Court relied on the existence of effective disclosure to shine a light on the newly permitted spending. As the Court explained,

> [a] campaign finance system that pairs corporate independent expenditures with effective disclosure has not existed before today . . . . With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters.

*Citizens United*, 558 U.S. at 370.

Finally, the Court also pointed to the mechanisms of corporate democracy. The Court rejected the shareholder-protection rationale of *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), and in doing so said that "procedures of corporate democracy" under corporate law could serve to correct whatever abuses might occur. For instance, "[s]hareholder objections raised through the procedures of corporate democracy," the Court said, "can be more effective today because modern technology makes disclosures rapid and informative." *Citizens United*, 558 U.S. at 370.

One further feature of *Citizens United* bears emphasis. Section 30118 operated only on corporations that already possessed, under the laws of their chartering states, the capacity to engage in election spending. Citizens United itself was organized

under Virginia law, *see* Am. Compl. ¶ 5, *Citizens United v. FEC*, No. 07-cv-2240 (D.D.C. Dec. 21, 2007), ECF No. 22, and nothing in that law withheld from it the power to produce and distribute political commentary. The question whether a state must confer such a power in the first place was not presented. Justice Scalia's concurrence made the point explicit: "in 1791 (as now) corporations could pursue only the objectives set forth in their charters," *Citizens United*, 558 U.S. at 386 (Scalia, J., concurring), and whether the common law treated political expenditures as ultra vires "would have nothing to do with whether political expenditures that were *authorized* by a corporation's charter could constitutionally be suppressed," *id.* at 389 n.5. Whether a corporation's charter must include the power to make political expenditure at all is a different question, and one the Court has never answered in Plaintiff's favor.[2]

### B. The "safeguards" that were supposed to minimize harms from corporate election spending have failed in the 16 years since *Citizens United*

Hawaiʻi's legislature found that the broad grant of "the same powers as an individual" that state law had historically conferred on corporations was never intended to include the power to make political expenditures, and it enacted Act 11

---

[2] As mentioned above, Defendants and other *amici* address why Act 11 is a corporate-law measure, not a speech restriction. *Amici*'s aim here is to place before the Court the record of what has occurred since 2010, which confirms the reasonableness of Hawaiʻi's legislative judgment under any standard of review.

"to make that intent explicit and to define the lawful powers of artificial persons accordingly." Act 11, § 1. That choice is a rational and well-supported one given the failure of every safeguard that *Citizens United* identified. Indeed, Hawai'i has acted in precisely the corporate-governance channel that the Court pointed to as a potential recourse for the harms of corporate election spending.

**1. Super PACs and coordination**

Within months of *Citizens United*, the en banc U.S. Court of Appeals for the D.C. Circuit extended its rationale to hold that, because the Supreme Court had said that independent expenditures cannot corrupt, contributions to a political committee that makes only independent expenditures cannot corrupt either, and thus cannot be limited. *See SpeechNow.org v. FEC*, 599 F.3d 686, 694-96 (D.C. Cir. 2010). The ultimate result was the "super PAC"—a vehicle that may accept unlimited contributions from corporate treasuries and wealthy individuals. In the 2024 election cycle alone, super PACs reported raising more than $5 billion. *Super PACs*, OpenSecrets, https://www.opensecrets.org/political-action-committees-pacs/super-pacs/2024 (last visited Sep. 21, 2026).

The premise on which this edifice rests—that such spending is "not coordinated with a candidate," 558 U.S. at 360—has proven to be a legal fiction. Candidates and super PACs now coordinate in broad daylight. Campaigns post detailed "redbox" instructions on their websites telling outside groups what

messages to run and where; they share common vendors who pass strategic information between campaigns and PACs; candidates headline super PAC fundraisers as "featured guest[s]"; and family members and former senior staff are installed to run the supposedly "independent" groups. *See* Campaign Legal Ctr., *The Illusion of Independence: How Unregulated Coordination Is Undermining our Democracy, and What Can Be Done to Stop It* 1, 22-46 (2023), https://perma.cc/BBY5-TYGM; Trevor Potter, *The Failed Promise of Unlimited "Independent" Spending in Elections*, 45 Hum. Rts. 22, 22-25 (2020). Indeed, just two weeks ago, the President described the super PAC supporting him as possessing "my money that I control," and announced that he was "allocating probably four or $500 million" of it to the midterm elections. Luke Fountain, *Trump says he will spend up to $500 million of 'my money' to help Republicans in midterms*, CNBC (Sep. 4, 2026).[3]

Meanwhile, federal enforcement against coordination has been nonexistent. In 2019, the FEC informed Congress that in the nine years since *Citizens United* it had *never* found probable cause to believe that *anyone* had violated the coordination rules, and that record has not changed since. Nor has the agency updated its coordination regulations since 2006, before super PACs existed. *See Illusion of*

---

[3] https://www.cnbc.com/2026/09/04/trump-maga-inc-500-million-republicans-midterm-elections.html (last visited Sep. 21, 2026).

*Independence*, *supra*, at 6-7, 20; Potter, *supra*, at 25. In short, what any realist would expect to occur has occurred.

**2. Dark Money**

*Citizens United* recognized that disclosure is critical to the health of American democracy: "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." 558 U.S. at 371. The Court promised that "effective disclosure" would mitigate the harms of corporate election spending. *Id.* at 370. But effective disclosure has not materialized. Nonprofit corporations organized under state law and recognized as "social welfare" organizations under section 501(c)(4) of the Internal Revenue Code are, absent a different choice by their chartering state, empowered by state law to spend on elections. They may retain their tax-exempt status so long as electoral activity is not their "primary activity," *see* 26 C.F.R. § 1.501(c)(4)-1(a)(2), and they need not register as federal political committees unless election activity is their "major purpose," *Buckley*, 424 U.S. at 79.[4] The Internal Revenue Code does not require

[4] Neither test constrains anything in practice. The IRS has never defined "primarily"; groups treat the test as satisfied so long as political spending stays under 49 percent. *See* Trevor Potter & Bryson B. Morgan, *The History of Undisclosed Spending in U.S. Elections & How 2012 Became the "Dark Money" Election*, 27 Notre Dame J.L. Ethics & Pub. Pol'y 383, 465-70 (2013). A court recently held the resulting standard void for vagueness. *Freedom Path, Inc. v. IRS*, 805 F. Supp. 3d 329 (D.D.C. 2025). The FEC, for its part, has never voluntarily concluded that a 501(c)(4) spender should have registered as a political committee, despite significant

them to disclose their donors to the public. *See* 26 U.S.C. § 6104(d)(3)(A). After *Citizens United*, such corporations were free to spend their treasury funds on independent expenditures and electioneering communications, and to contribute unlimited sums to super PACs, all without revealing the sources of their money.

Undisclosed spending in federal elections ballooned from less than $5 million in 2006 to more than $1 billion in the 2024 presidential election alone, and to a record $1.9 billion across all 2024 races. Daniel I. Weiner, *Citizens United, Explained*, Brennan Ctr. for Just. (updated Jan. 29, 2025), https://perma.cc/8MCU-4T35; Anna Massoglia, *Dark Money Hit a Record High of $1.9 Billion in 2024 Federal Races*, Brennan Ctr. for Just. (May 7, 2025), https://perma.cc/22DL-CRSJ. In 2024, a single super PAC reported a $205 million contribution from an affiliated dark money nonprofit whose donors will likely never be known. *How Does the Citizens United Decisions Still Affect Us in 2026?*, Campaign Legal Ctr. (Jan. 21, 2026), https://perma.cc/8C2Z-NC8E. Within five years of the *Citizens United* decision, Justice Kennedy, who authored the majority opinion, conceded that the disclosure he had envisioned was "not working the way it should." Paul Blumenthal, *Anthony Kennedy's Citizens United Disclosure Salve 'Not Working'*, HuffPost (Nov.

---

evidence to the contrary. *See* Trevor Potter, *A Dereliction of Duty: How the FEC Commissioners' Deadlocks Result in a Failed Agency and What Can Be Done*, 27 Geo. Mason L. Rev. 483, 489-98 (2020).

2, 2015), https://www.huffpost.com/entry/citizens-united-anthony-kennedy _n_5637c481e4b0631799134b92. And the harm is not abstract: the Speaker of the Ohio House was convicted of racketeering after some $60 million was routed through a 501(c)(4) corporation under his control—funds he used in part for supposedly independent expenditures supporting his allies. *See United States v. Householder*, 137 F.4th 454, 464-70 (6th Cir. 2025).

Plaintiff answers this record by recasting corporations as nothing more than "associations of citizens" who wish to "pool their resources" to speak. Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 2, 27, ECF No. 15-1 ("PI Mem.") (quoting *Citizens United*, 558 U.S. at 354). But campaign finance law already accommodates citizens who wish to speak collectively about elections; it only asks that they say who they are. Individuals who join together to make independent expenditures or electioneering communications, or who form a political committee to do so, must report their spending and identify the people who fund it. *See* 52 U.S.C. § 30104(b), (c), (f); Haw. Rev. Stat. §§ 11-321, 11-335(b), 11-341 (2025). What the corporate form and other forms of artificial personhood add is anonymity. A corporation or LLC is a legal person separate from the humans behind it, and which has perpetual existence while being capable of being created and dissolved quickly. When it spends, any report that is filed names the entity, not the persons who funded it, and because the entity need not outlive the election, it can be formed after the last pre-

election reporting deadline, spend, and dissolve before anyone can ask questions about who was behind it.

This is not a hypothetical and Hawai‘i has seen it firsthand. In late November 2019, a Hawai‘i LLC calling itself the "Society of Young Women Scientists and Engineers" was formed. Five weeks later, it gave $150,000 to a super PAC supporting a U.S. Senate candidate in Maine. The LLC had no website, no business, and no apparent revenue. As three executives later admitted in pleading guilty, it was a shell for a Hawai‘i defense contractor barred from contributing at all. The contractor's successor was eventually fined, but not until more than five years after the election, by which time the super PAC had spent the money and terminated. *See* Conciliation Agreement, MUR 7690, *PacMar Techs., LLC* (FEC Feb. 13, 2025), https://perma.cc/GH2Y-HEH4; Shanna Ports, *Major Victory: CLC Complaint Delivers Rare Accountability for Maine Voters*, Campaign Legal Ctr. (May 5, 2025), https://perma.cc/R7VX-N9B5. No "association of citizens" could have done that under any campaign finance regime. The artificial person is what made it possible, and the State of Hawai‘i was entitled to take that difference into account.

**3. Direct corporate treasury spending**

Before *Citizens United*, corporations authorized by their chartering states to participate in elections could do so only through "separate segregated funds" financed by voluntary and limited contributions from their executives, shareholders,

and members. 52 U.S.C. § 30118(b)(2), (4)(A); *see FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 254-56 (1986). Section 30118 was enacted to prevent the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form" from being deployed in elections. *Austin*, 494 U.S at 660. *Citizens United* eliminated that separation. Since then, for-profit corporations have reported contributing $1.58 billion from their treasuries to super PACs and "hybrid"[5] PACs in federal elections. Rick Claypool, *Corporate Supremacist Super PACs Drive $500 Million Midterm Spending Surge*, Pub. Citizen (June 30, 2026), https://perma.cc/8A7D-WEMJ. The 2024 cycle saw a record $461 million in contributions from corporate treasuries, and that record has already been surpassed in 2026, with corporations reporting $517 million in treasury contributions before Election Day, nearly triple the amount reported in the last midterm cycle. *Id.* A growing share of this money flows to single-industry super PACs organized to reward or punish candidates of either party based solely on their positions on that industry's regulation. *Id.* These figures, moreover, understate the true total, because

---

[5] A "hybrid" PAC is a political committee that maintains two segregated accounts: one that accepts unlimited contributions and is used only for independent expenditures, like a super PAC, and one that accepts contributions within FECA's limits and may contribute directly to candidates. The FEC recognized the structure after a consent judgment in *Carey v. FEC*, No. 11-cv-259 (D.D.C. Aug. 19, 2011), ECF No. 26. *See* Press Release, FEC Statement on *Carey v. FEC*, Reporting Guidance for Political Committees that Maintain a Non-Contribution Account (Oct. 5, 2011), https://perma.cc/B5LU-DSBQ.

for-profit corporate money routed through 501(c)(4) and 501(c)(6) organizations is not reported at all. *Id.*

* * *

Given this record, it is unsurprising that states have begun to look at their own corporate codes. Hawai‘i is the first state to act by statute, and Montana voters will consider a similar initiative this November. *See* Mont. Sec’y of State, *Proposed 2026 Ballot Issues*, https://perma.cc/4EY7-M4BJ (last visited Sep. 15, 2026). These measures address the very harms that *Citizens United* assumed away—coordination, secrecy, and the deployment of aggregated corporate wealth in elections—through the one channel the Court expressly left to the states. “[T]he objectives that may properly be pursued” by a corporation “are governed by the laws of the States in which they were incorporated,” *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 713 (2014), and “[n]o principle of corporation law and practice is more firmly established than a State’s authority to regulate domestic corporations,” *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). The Legislature’s judgment that Hawai‘i’s artificial persons should not possess the power to spend in Hawai‘i elections is, at a minimum, a rational one given the spectacular failure of each safeguard *Citizens United* incorrectly assumed would protect elections from corporate abuse.

## II. Act 11 Is Not Unconstitutionally Vague

A statute is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Yamada*, 786 F.3d at 1187. Act 11 does not implicate the First Amendment, and so less stringent scrutiny applies to Plaintiff's claims. But even where expressive activity is involved, "perfect clarity and precise guidance" are not required, *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), because "we can never expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110.

Plaintiff's vagueness challenge is necessarily a facial one,[6] and it must therefore satisfy a heightened standard. "[U]ncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its intended applications." *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (internal quotation marks omitted). Only if a law is so vague that it suppresses otherwise permissible speech in virtually every application will it be struck down on its face. *See Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1155 (10th Cir. 2007). Speculation about what a person may have trouble

---

[6] Because the Act does not take effect until July 1, 2027, Act 11, § 27, and Plaintiff seeks to enjoin it in its entirety, the challenge is necessarily a facial one. No application of the Act to any actual communication is before the Court.

deciphering is not grounds for the "strong medicine" of facial invalidation. *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988) (citation omitted). Act 11 easily meets this standard.

### A. Act 11's "support or oppose" standard is not unconstitutionally vague

Act 11 defines "election activity" as "paying, contributing, or expending money or anything of value to support or oppose a candidate, political party, or political committee," and "ballot-issue activity" as the same conduct undertaken "to support or oppose a constitutional amendment, county charter amendment, or other ballot question after it has been formally certified or submitted to the electors." Act 11, §§ 4, 8. Plaintiff contends that the words "support" and "oppose" fail to warn speakers what is covered. *See* PI Mem. at 23-25. That contention is foreclosed by controlling authority.

The Supreme Court rejected precisely this argument in *McConnell*. Reviewing a federal provision reaching public communications that "promote[] or support[]" a candidate or "attack[] or oppose[]" a candidate, the Court held that these words "clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision," because they "'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" 540 U.S. at 170 n.64 (quoting *Grayned*, 408 U.S. at 108-09).

The Ninth Circuit applied *McConnell* to Hawai‘i’s own campaign finance code in *Yamada*. There, the court rejected a vagueness challenge to the definition of “advertisement” in Haw. Rev. Stat. § 11-302 (2025), which reaches communications that “[a]dvocate[] or support[] the nomination, opposition, or election of the candidate.” 786 F.3d at 1192-94. The court held that these terms were “substantially similar to the words ‘promote,’ ‘oppose,’ ‘attack’ and ‘support’ that survived a vagueness challenge in *McConnell*,” and concluded that the definition was “sufficiently precise without a limiting construction.” *Id.* at 1192. Every other court of appeals to consider the question agrees. *See Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128-30 (2d Cir. 2014); *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 286-87 (4th Cir. 2013); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 485-87 (7th Cir. 2012); *Nat’l Org. for Marriage v. McKee*, 649 F.3d 34, 62-64 (1st Cir. 2011).

Act 11 uses essentially the same formulation. And as in the statutes upheld in *McConnell* and *Yamada*, its terms are tethered to a specific electoral object: a “candidate, political committee, or political party,” or a ballot question that has been “formally certified or submitted to the electors.” Act 11, §§ 4, 8; *see Yamada*, 786 F.3d at 1193 (“[S]upport” and “opposition” are clear because “their proximity to ‘nomination’ or ‘election of the candidate’ make clear the sort of campaign-related

advertising" covered.); *McKee*, 649 F.3d at 64 (terms not vague because tied to an "election-related object").

Nor does the phrase "directly or indirectly" introduce vagueness. That formulation is a staple of campaign finance law. Hawai'i's own prohibition on contributions by government contractors bars them from "[d]irectly or indirectly" making any contribution, Haw. Rev. Stat. § 11-355(a)(1), and the Ninth Circuit upheld that provision without any suggestion that its language was unclear. *Yamada*, 786 F.3d at 1204-07. The Ninth Circuit squarely held that "'[i]ndirectly' is an easily understood word in common English usage" that is "neither vague nor difficult to understand" in a campaign finance statute. *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 783 (9th Cir. 2006). *See also* 52 U.S.C. § 30121(a)(1) (prohibiting foreign nationals from making contributions "directly or indirectly").

Plaintiff suggests that Act 11 must confine itself to express advocacy or its functional equivalent. *See* PI Mem. at 24. But that is an argument about the Act's breadth, not its clarity, and *McConnell* rejected the premise that campaign finance definitions must be limited to express advocacy to be sufficiently definite. *See* 540 U.S. at 170 n.64; *see also Yamada*, 786 F.3d at 1192 (upholding Hawai'i's "advocates or supports" definition "even without a limiting construction"). Nor can Plaintiff's list of hypothetical edge cases—whether the Act reaches "buttons, banners and bumper stickers," or "staff time to retweet a social media post," PI Mem. at 24-25—

sustain a facial challenge. The facial relief Plaintiff seeks requires more than "speculation about possible vagueness in hypothetical situations not before the Court." *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). "Close cases can be imagined under virtually any statute," *Williams*, 553 U.S. at 306, and "there will always be an inherent but permissible degree of uncertainty in applying any standards-based test," *Yamada*, 786 F.3d at 1191. The core applications of Act 11 are not uncertain at all. Plaintiff claims that its new affiliate "will . . . engage in advocacy for and against ballot measures," Compl. ¶ 19, ECF No. 1, and that its longstanding practice is to "opine[] on ballot issues," *id.* ¶ 8. A person of ordinary intelligence has no difficulty recognizing that paying to support or oppose a certified ballot question is "ballot-issue activity." Act 11, § 4.

**B. "Bona fide news" and similar terms are not unconstitutionally vague**

Plaintiff next asserts that Act 11 "provides no way of knowing the difference between bona fide news and prohibited activity." Compl. ¶ 95. But "bona fide" is among the most familiar phrases in law. It means "[m]ade in good faith; without fraud or deceit," or "[s]incere; genuine," *Bona Fide*, Black's Law Dictionary (12th ed. 2024), and courts have long recognized that it "has many applications in the law" and "is generally used according to its dictionary definition." *Griffin v. Lockhart*, 935 F.2d 926, 929 n.2 (8th Cir 1991) (citation modified). The United States Code

uses the phrase countless times in varied contexts. *See, e.g.*, 42 U.S.C. § 2000e-2(e) (Title VII provision permitting employment decisions based on religion, sex, or national origin where such a characteristic is a "bona fide occupational qualification," a standard courts have applied for decades).

More to the point, Act 11's media exemption is modeled on federal law. Since 1974, the Federal Election Campaign Act has excluded from the definition of "expenditure" "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate." 52 U.S.C. § 30101(9)(B)(i); *see* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, 88 Stat. 1263 (1974). The FEC's implementing regulations have long framed the exemption in terms of a "bona fide news account." 11 C.F.R. §§ 100.73(a), 100.132(a). Act 11's exemption for "any bona fide news story, commentary, or editorial distributed through the facilities of a broadcasting station or of any print, online, or digital newspaper, magazine, blog, or other periodical publication, unless the . . . facility is owned or controlled by a candidate, political committee, or political party," Act 11, §§ 4, 8, is modeled on this federal template.

And importantly, that template has been applied by the FEC and litigated in the courts for half a century. *See, e.g.*, *Mass. Citizens for Life, Inc.*, 479 U.S. at 250-

51 (applying the exemption); *Reader's Dig. Ass'n v. FEC*, 509 F. Supp. 1210, 1214-15 (S.D.N.Y. 1981) (same); *FEC v. Phillips Publ'g, Inc.*, 517 F. Supp. 1308, 1312-13 (D.D.C. 1981) (same); *see also Citizens United*, 558 U.S. at 352 (discussing the exemption). *Amici* are aware of no decision in those 50 years holding the operative language unconstitutionally vague, a striking absence given the frequency with which the exemption has been invoked. States have likewise adopted the federal formulation, *see, e.g.*, Vt. Stat. tit. 17, § 2902(1); Or. Rev. Stat. § 260.007(1)—including Hawai‘i, whose electioneering communications law already excludes communications "[i]n a news story or editorial disseminated by any broadcast station, publisher of periodicals or newspapers, or by electronic means," Haw. Rev. Stat. § 11-302 (2025) (defining "electioneering communication"). West Virginia's statute uses the phrase "bona fide news account"; the one vagueness challenge to that language was dismissed on standing grounds without any suggestion that the claim had merit. *See Tennant*, 706 F.3d at 289 (citing W. Va. Code § 3-8-1a(11)(B)(i)). If anything, Act 11 is more precise than its federal model since the qualifier "bona fide" makes explicit what the FEC has always read into the federal statute.

Plaintiff now contends that "bona fide," because it means "in good faith" or "genuine," imports the kind of intent-based test that *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 468 (2007) (opinion of Roberts, C.J.), condemned. Pl.'s Opp'n

to Mot. to Dismiss at 28-29, ECF No. 25. That misreads both the Act and *Wisconsin Right to Life, Inc.*, where the concern was a test turning on a speaker's subjective purpose in running an issue advertisement, so that the speaker's "only defense" would be that "its motives were pure." 551 U.S. at 468. The press exemption asks a different and objective question: whether a communication is in fact a news story, commentary, or editorial, rather than something else wearing that label. That is how the federal exemption has been applied for decades, with courts and the FEC asking whether the material was distributed in the exercise of a legitimate press function. *See Reader's Dig.*, 509 F. Supp. at 1214-15; *Phillips Publ'g*, 517 F. Supp. at 1312-13. Nothing in that inquiry requires any speaker to prove the purity of its motives.

Plaintiff's objection, at bottom, is not that it cannot tell what a "bona fide news story, commentary, or editorial" is. Instead, Plaintiff claims that the Act exempts such content when distributed by media entities while allegedly reaching the same content when Plaintiff distributes it. *See* Compl. ¶ 63. That is effectively a complaint about the alleged scope and existence of a media exemption—an exemption the Supreme Court has repeatedly acknowledged as legitimate—not about the clarity of its terms. An objection to a statute's policy is not a basis for a facial vagueness claim.[7]

---

[7] Even were the Court to perceive some ambiguity at the margins of these terms, facial invalidation would not follow. A federal court "must uphold a statute if it is

## CONCLUSION

For the foregoing reasons, and those stated by Defendants, *amici* respectfully submits that Plaintiff's Motion for Preliminary Injunction should be denied and Defendants' Motion to Dismiss should be granted.

Dated: September 24, 2026

Respectfully submitted,

/s/ Mateo Caballero
MATEO CABALLERO (HI Bar No. 10081)
CABALLERO LAW LLLC
P.O. Box 235052
Honolulu, Hawaiʻi, 96823
Telephone: (808) 600-4749
mateo@caballero.law

ERIN CHLOPAK*
KEVIN P. HANCOCK*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
echlopak@campaignlegal.org
khancock@campaignlegal.org

STUART MCPHAIL*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20004
Telephone: (202) 408-5565

'readily susceptible' to a narrowing construction that would make it constitutional." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000) (citation modified); *see Yamada*, 786 F.3d at 1188 & n.2 (court "must consider any limiting construction that a state court or enforcement agency has proffered") (citation modified).

smcphail@citizensforethics.org
*Attorneys for* Amici Curiae

**Admitted* pro hac vice